The bill counts purely in tort for damages, charging the banks as participants in Hendricks' embezzlement of receivership funds of the insolvent Earl Radio Corporation. The charges of participation are confined to diversion of funds from receivership bank accounts (the bill treats the deposits in the "H.G. Hendricks Receiver" accounts in the Franklin-Washington Trust Company and the Livingston State Bank, as receivership accounts) to Hendricks' personal bank accounts and the bank account of his company, Livingston Sand and Gravel Company, by means of the items above listed. The charges are that the banks upon which the checks were drawn and the banks receiving them, respectively, paid and received them with actual knowledge that Hendricks was committing breaches of his obligations as receiver, or with knowledge of such facts as amounted to bad faith. It *Page 270 
is alleged that after depositing the items to his personal accounts, Hendricks converted the funds to his own use, but there is no charge of complicity in the conversion and it is not an issue.
There are three instances in respect of which it is charged that checks on receivership accounts, deposited in the Kearny National Bank, were used to pay debts due that bank from Hendricks' company, suggesting that the trust res is sought, but there is no supporting evidence, and the charge will stand dismissed. In the argument complainants allude to other occasions where deposits of trust funds in Hendricks' personal accounts paid overdrafts to banks, and urge that the facts are conclusive of liability as to the items. Not having been pleaded as causes for action, they are, at best, but evidence upon the question of bad faith in the main issue.
The charges that the banks had actual knowledge of Hendricks' misconduct are not pressed and are out of the case.
The charges that the banks had knowledge of such facts that their actions amounted to bad faith, in so far as they are builded upon the assumption that the checks by which the diversion of the funds was accomplished, on their face put the banks on duty to inquire, and, consequently, that the banks were charged with notice that Hendricks was diverting the Earl radio receivership deposits to his personal accounts, directly or through the "H.G. Hendricks Receiver" accounts in the Franklin-Washington Trust Company and the Livingston State Bank, are without legal substance.
The liability of banks to cestuis for fiduciaries' deposits is governed exclusively by the Uniform Fiduciaries act (P.L.1927 p. 65), and the two sections quoted in the fore-piece rule this case. Section 7 renders a bank immune from liability in honoring a fiduciary's check, "unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check, or with knowledge of such facts that its action in paying the check amounts to bad faith." Section 9 is an extension of the immunity to banks receiving fiduciaries' checks for deposit to their personal account and honoring their personal checks *Page 271 
thereon, unless they have knowledge of the breach of trust or act in bad faith. The standard of due care or negligence and the doctrine of constructive notice in respect of bank deposits of fiduciary funds find no recognition in the Fiduciaries act. It definitely declares bad faith to be the test of liability. That was the rule at common law, and the statute but embodies the common law rule, making uniform its application and realigning whatever deviations it may have fallen into. "The general purpose of the act," the commissioners say (9 U.L.A. 147), "is to establish uniform and definite rules in place of the diverse and indefinite rules now prevailing as to `constructive notice' of breaches of fiduciary obligations. In some cases there should be no liability in the absence of actual knowledge or bad faith; in others there should be action at peril."
The relation of a bank to a trustee-depositor is that of creditor and debtor. The bank's obligation is to the trustee, to honor his checks when drawn to form. It owes no duty to the trust estate save to refrain from participating in misappropriation of the funds. Perry Trusts (7th ed.) 176. Thus, Perry (at p.177) says: "The mere payment of the money to or upon the check of the depositor does not constitute a participation in an actual or intended misappropriation by the fiduciary, although his conduct or course of dealing may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust. Such circumstances do not impose upon the bank the duty or give it the right to institute any inquiry into the conduct of its customer, in order to protect those for whom the customer may hold the fund, but between whom and the bank there is no privity." This immunity of banks from liability for trustees' accounts has been declared by the house of lords inGray v. Johnston, L.R. 3 H.L. 1, by the United States supreme court in Central National Bank of Baltimore v. ConnecticutMutual Life Insurance Co., 104 U.S. 54, and by this court inBoard of Chosen Freeholders v. Newark City National Bank,48 N.J. Eq. 51. The United States supreme court in the case just cited, said: "A bank account, it is true, *Page 272 
even when it is a trust fund and designated as such by being kept in the name of the depositor as trustee differs from other trust funds which are permanently invested in the name of trustees for the sake of being held as such. For a bank account is made to be checked against and represents a series of current transactions. The contract between the bank and the depositor is that the former will pay according to the checks of the latter, and when drawn in proper form the bank is bound to presume that the trustee is in the course of lawfully performing his duty, and to honor them accordingly." Judicial illustration of the non-liability of either the payer or the collecting bank, acting in good faith, is furnished by Havana Central Railroad Co. v.Knickerbocker Trust Co., 198 N.Y. 422, and Havana CentralRailroad Co. v. Central Trust Co., 204 Fed. Rep. 546. They involved the same transactions: The railroad company had its account with the Central Trust Company, upon which its treasurer, C.W. Van Voorhis had authority to draw checks signed, "Havana Central Railroad Company, C.W. Van Voorhis, Treasurer." He drew checks in due form payable to the order of "W.M. Greenwood or C.W. Van Voorhis," which he endorsed "C.W. Van Voorhis" and deposited in his personal account in the Knickerbocker Trust Company. They were forwarded to and paid by the Central Trust Company. In the suit against the Knickerbocker Trust Company, the New York court of appeals held:
"* * * the Knickerbocker Trust Company in the present case did all that the law demands. When it caused the three checks to be presented to the Central Trust Company for payment, it thereby virtually made a twofold inquiry of that institution: (1) Whether the checks bore the genuine signature of an officer authorized to sign checks in behalf of the Havana Central Railroad Company, and (2) whether C.W. Van Voorhis, the treasurer of the Havana Central Railroad Company, had authority to draw checks upon the account of the corporation payable to his individual account. The drawee of a bill of exchange is bound to know the signature of the drawer and his capacity to draw the bill. 1 Dan. Neg. *Page 273 Inst. (4th ed.) 534, 535. The acceptance of the bill is an acknowledgment of the genuineness of the signature and the authority of the drawer. So the payment of these checks by the Central Trust Company upon their presentation at the instance of the Knickerbocker Trust Company was an acknowledgment by the deposit bank of the Havana Central Railroad Company that C.W. Van Voorhis, its treasurer, possessed authority from the railroad corporation to draw precisely such checks in precisely the form in which they were drawn. The Havana Central Railroad Company by opening its deposit accounts with the Central Trust Company constituted the latter corporation its agent as to all third parties who might receive checks drawn upon that account to determine and declare whether such checks were genuine and were drawn within the scope of the treasurer's agency as established by the contract between the Central Trust Company and the railroad corporation. When the Central Trust Company by paying these checks declared to the Knickerbocker Trust Company that they were genuine obligations of the railroad corporation which the treasurer had authority to draw, the Knickerbocker Trust Company was not obligated by law to make any further inquiry, but was authorized to deal with the proceeds of the checks as individual property of the payee, and after it has turned over such proceeds to him it cannot be compelled to restore them to the Havana Central Railroad Company merely because the Central Trust Company ought to have withheld the payment of the checks."
In deciding that the Central Trust Company was not liable, the federal court held:
"So far as this defendant was concerned there was nothing suspicious about the checks except that they were drawn by the general fiscal officer to his own order and were endorsed by him; other similar checks had been drawn and paid before. The defendant did not know the history of the checks. It did not have the knowledge of the Knickerbocker company that the treasurer was using the checks for his personal benefit. That which it knew was that which appeared on the checks themselves when presented for payment. *Page 274 
It appeared that the treasurer might have been guilty of a breach of trust and have been attempting to misappropriate the moneys of his corporation. On the other hand there might have been no breach of trust. The checks might have been drawn in favor of the treasurer for entirely legitimate corporate purposes. Transactions were disclosed which might or might not have been breaches of trust according to circumstances, unknown to the defendant. In such circumstances, we think that it was not the duty of the defendant to question the checks and that the language of Judge Hammond in Walker v. Manhattan Bank
(C.C.), 25 Fed. Rep. 247, 255, upon an analogous subject, is applicable:
"`At all events the bailee must know that the contemplated appropriation is a breach of trust, not merely that a certain transaction is about to be consummated, which may or may not be a breach of trust, according to circumstances unknown to him.'"
Criticism of Judge Noyes of the statement in the KnickerbockerCase that the Central Trust Company was the agent of the railroad company, was softened by the remarks of Chief-Justice Cardozo in Whiting v. Hudson Trust Co., 234 N.Y. 394: "There may be technical inaccuracy in describing the drawee bank as the depositor's agent for the purpose of making representations as to the fiduciary's powers. The relation is one, not of agency, but of debtor and creditor. The bank is chargeable, however, with knowledge of the signature of the drawer, and of his authority to draw. Knowledge of its action in making payment of the paper may, therefore, take the place, within reasonable limits, of other investigation and inquiry by the collector of the proceeds." InBischoff v. Yorkville Bank, 218 N.Y. 106, the court of appeals of New York reaffirmed the doctrine that "although the depositor is drawing checks which the bank may surmise or suspect are for his personal benefit, it is bound to presume, in the absence of adequate notice to the contrary, that they are properly and lawfully drawn."
Authorities are plentiful that likewise checks upon trust funds to the order of the trustee personally, deposited to the *Page 275 
personal account of the trustee, though the trust account and the personal account be in the same bank, are bound to be honored without inquiring into the transaction and free of notice of irregularity. In Maryland Casualty Co. v. City National Bank,29 Fed. Rep. 2d 662, the trustee drew checks on his trust fund account and deposited them to his personal account in the same bank. The claim that this was an unlawful conversion in which the bank aided, and that certain Tennessee cases supported the contention, was met by: "* * * but those cases are in the minority, and the better reasoned cases hold that, in the absence of a statute making it so, the drawing of a check in due form upon a trust fund and depositing of it in the same bank to the personal credit of the trustee is neither a conversion or misappropriation of the fund nor notice to the bank of any such purpose. Under these authorities it cannot be held that the bank aided in the misappropriation by merely accepting for deposit in the personal account checks drawn on the trustee account."Goodwin v. American National Bank, 48 Conn. 550; Allen v.Fourth National Bank, 224 Mass. 239; New Amsterdam Casualty Co.
v. Robertson, 129 Or. 663; Taylor v. Astor National Bank,174 N Y Supp. 279; Manufacturers' Trust Co. v. United StatesMortgage and Trust Co., 204 N.Y. Supp. 105; affirmed, 244 N.Y. 550,
all are cases where the trustee had his trust and personal accounts in the same bank and drew on the former for deposit in the latter, and the banks were held not liable. See, also, Cityof Helena v. First National Bank of Helena, 173 Ark. 197;McCullam v. Third National Bank, 209 Mo. App. 266; UnitedStates Fidelity and Guaranty Co. v. Home Bank for Savings,77 W. Va. 665; Ogden v. Atlantic National Bank,176 N.E. Rep. 799, all holding that deposits of trust funds in the trustee's personal account do not put the banks on inquiry.
The cases called to their support by complainants all deal with inculpatory elements not within the scope of the bill of complaint and are broadly distinguishable from the authorities just cited in that in some the banks had knowledge of the wrongful diversion or benefited by the misappropriation, and *Page 276 
the suits proceeded upon the theory of following the trust res;
in others the checks were not drawn to form — the trustee lacked power, and the actions were to recover the deposits as the property of the plaintiff, unaffected by the faulty checks. InMassachusetts Bonding and Insurance Co. v. Standard Trust andSavings Bank, 334 Ill. 494, the trust fund was used to pay the trustee's notes held by the bank. The bank was held liable also for other items, upon the finding that it had guilty knowledge of the misappropriation. This quotation from Allen v. PuritanTrust Co., 211 Mass. 409, gives the answer: "The payments to itself [bank], with the accompanying transfers from the estate's account to his [fiduciary] private account could not have been accomplished without the active instrumentality of the defendant." In United States Fidelity and Deposit Guaranty Co.
v. Union Bank and Trust Co., 228 Fed. Rep. 448; Bischoff v.Yorkville Bank, supra, and Gilliland v. Lincoln AllianceBank and Trust Co., 261 N.Y. Supp. 826, the banks participated in the misappropriation to their own benefit. In this class belongs Pennsylvania Co., c., v. Ninth Bank and Trust Co.,158 Atl. Rep. 251. In Norristown-Penn Trust Co. v. Middleton,150 Atl. Rep. 885, the assistant treasurer of the bank paid his margin calls to his brokers, the defendants, with treasurer's checks, signed by him, and the court's quotation shows the crux of the decision. "Bad faith in taking commercial paper does not necessarily involve furtive motives, for it exists when the purchaser has notice of facts which, if unexplained, would show that he was taking the property of one who * * * owed him nothing, in payment of a claim that he held against some one else." In Fidelity and Deposit Company of Maryland v. QueensCounty Trust Co., 226 N.Y. 225, the trustee in bankruptcy had not the power to draw funds without the counter-signature of an officer of the court, and the bank was held liable for the misappropriation. Coming now to the cases in our state: Jeffray
v. Towar, 63 N.J. Eq. 530, was a bill by a cestui for an accounting from a broker's estate, for trust funds deposited by the trustee in a trustee's account. The defense sought to offset the trust obligation by a personal *Page 277 
debt due from the trustee. In denying the right to set off, Vice-Chancellor Emery held that the broker, if he had not actual knowledge, was put upon inquiry as to the nature of the trust account; that he could not help himself out of the trust funds. In Ordway Building and Loan Association v. Moeck, 106 N.J. Eq. 425,
the bill sought to impress a lien upon land for the amount of a check misappropriated by the complainant's trustee in paying off a mortgage on the land. The check was a trustee check. Vice-Chancellor Berry held, and properly, that the payee, which also had other information, was put upon inquiry and that proper inquiry would have led to knowledge. They are not bank deposit cases. American Saw Co. v. First National Bank,60 N.J. Law 417, was to recover the plaintiff's deposit with the bank to the amount of checks drawn on it by the secretary of the plaintiff without authority — power. Dennis Metal Manufacturing Co. v.Fidelity Union Trust Co., 99 N.J. Law 365, was for the recovery of the amount of a check to the order of the plaintiff company, endorsed by its president without authority — power and deposited to his personal account with the defendant bank. In Robbins v.Passaic National Bank and Trust Co., 109 N.J. Law 250, the plaintiffs recovered partnership deposits improperly diverted by the bank, by means of partnership checks, to the payment of debts due to it from one of the partners. In all these cases the defendants unlawfully invaded the trust funds; a factor not in this suit. Here the gravamen is bad faith.
The Fiduciaries act gives no definition of bad faith, but it defines good faith as a thing done "when it is in fact done honestly," whether it be done negligently or not. Conversely bad faith must be a thing done when it is in fact done dishonestly. According to Judge Wooley in Browning v. Fidelity Trust Co.,250 Fed. Rep. 321, "bad faith, though an indefinite term, differs from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will. It contains the element of intent to do wrong in some degree, actual or necessarily inferable." Mr. Justice *Page 278 
Garrison, in Rice v. Barrington, 75 N.J. Law 806, gave bad faith its short and natural meaning of fraud. Read in the light of its statutory context, bad faith, with its sinister implications, means knowledge by any responsible agency, officer or employe, of a bank, of an incriminating state of facts, short of actual knowledge of the breach of trust, but conscious of it and aiding and abetting, or acquiescing in the breach.
There is no proof of circumstances from which it reasonably may be inferred that any one of the banks was cognizant of Hendricks' scheme of switching receivership funds to his personal account to facilitate his thievery. On the contrary, it is established that they and each of them acted in utmost good faith.
Hendricks had been and was receiver for scores of insolvent corporations, appointed by the court of chancery, and was as many times bonded by corporations engaged in that line of business, and by the complainants who, in this cause, stood sponsor for him to the tidy sum of $150,000 and gave him a free hand, without the slightest supervision over the funds, as they might have had by the statute. Comp. Stat. p. 2852. He was of good business repute, supposedly a man of means, the head of two corporations and had a fair line of credit at the banks The affairs of the Earl Radio Corporation, conducted by him for a period of two years, were of large dimensions, and his bank transactions were many, and often in high figures. Tables in the complainants' brief (except Franklin-Washington Trust Company) are but few excerpts of widely separated items from the bank accounts, upon which they rely to convict the banks of maladministration; comparatively they are miscroscopic.
The National Newark and Essex Banking Company honored two checks, April 13th and May 21st, 1931, of $10,000 each, to Hendrick's order, deposited to his personal account in the Franklin-Washington Trust Company (8) and the Fidelity Union Trust Company (9) respectively. They were paid in the ordinary course through the clearing house.
Note — Three checks upon this account, aggregating *Page 279 
$40,000, to the order of "H.G. Hendricks Receiver," deposited to that account in the Franklin-Washington Trust Company (10-11-12), were paid later. They are not assailed as unlawfully diverted, and, of course, have no bearing upon the good faith of the bank in honoring the earlier checks.
The Kearny National Bank honored a $9,000 check (4) on the receivership account, to the order of Hendricks, and credited it to his personal account, and a check (5) for $5,000 to the order of the Livingston Sand and Gravel Company, which was credited to the company's account. Two checks for $1,500 each to the order of Hendricks on the "H.G. Hendricks Receiver" account in the Franklin-Washington Trust Company, were credited to the account of the Livingston Sand and Gravel Company. All were routine transactions.
Note — Forty thousand dollars in two checks to the order of "H.G. Hendricks Receiver," deposited in the "H.G. Hendricks Receiver" account in the Franklin-Washington Trust Company (6 and 7), came sometime afterwards. They are not claimed to have been misappropriations, and their dates preclude reflection upon thebona fides of the items under attack.
The Livingston State Bank "H.G. Hendricks Receiver" account is concretely set out in the fore-piece. Four checks, aggregating $11,000, came through the clearing house from the Fidelity Union Trust Company, and two, totaling $3,500, from the Franklin-Washington Trust Company. They and the two items of $4,700 drawn to "cash," paid over the counter, were without incident and in the regular course of business. ($10,000 of the total of $20,000 deposited in this institution were not traced to trust funds.) It is said that this was a one-man bank, with a bookkeeper or two and clerks, but the law does not distinguish, in duty to depositors, between a bank operated by a few or one operated by a few hundred employes. The opportunity for discovering fraud in the one may be better than in the other, but the obligation to depositors of the one-man bank is no different from that of larger institutions; nor is the immunity from *Page 280 
liability, if it does not dip into the fund or otherwise act in bad faith. It was through this account, to the extent of $10,000 and the "H.G. Hendricks Receiver" account in the Franklin-Washington Trust Company, to the tune of $95,000, that Hendricks shifted receivership funds into his personal accounts. All the checks drawn upon the "H.G. Hendricks Receiver" accounts in the Livingston State Bank as well as in the Franklin-Washington Trust Company, and from time to time diverted to one or the other of Hendricks' personal accounts in other banks, or paid over the counter, were without circumstances recognized by the authorities as warranting either bank in refusing payment. Draining of these accounts into Hendricks' private accounts, if noticed, may have aroused suspicion, but that would not have been enough to halt the bank in discharging its obligation to the depositor.
In the Franklin-Washington Trust Company's "H.G. Hendricks Receiver" account, Hendricks deposited six receivership checks aggregating $95,000 — two of them, of a total of $25,000, from the Fidelity Union Trust Company. He withdrew this huge sum to his own order (one check was for $31,752.06 to his order as receiver and deposited to his account as receiver of Strieby 
Foote in the First National Bank of Millburn, evidently to cover a shortage) of which $39,500 were in seven checks deposited to his personal account in the Fidelity Union Trust Company. The shuttling of receivership funds from the Fidelity Union Trust Company into the "H.G. Hendricks Receiver" account in the Franklin-Washington Trust Company and back again to Hendricks' personal account in the Fidelity, it is urged, was notably conspicuous as breaches of trust that reasonably could not have escaped the notice of these banks. Glaring as the scheme now shows up, it is nevertheless established that it did not come to the attention of the Franklin-Washington Trust Company until after the account in that bank had been nearly exhausted and payment of a check had been refused for insufficient funds. The first notice the Fidelity Union Trust Company had was after the exposure came in April, 1932.
The receivers' account in the Fidelity was the business *Page 281 
account of the receivership. Deposits exceeded two and a half million dollars and withdrawals were almost daily, numbering more than a thousand, in checks small and large, among them the "checks missing" of September 30th, 1930, $10,000 (1) and October 15th, 1930, $15,000 (2), deposited in the "H.G. Hendricks' Receiver" account in the Franklin-Washington Trust Company, and the check of November 4th, 1931, $10,000 (3), deposited to Hendricks' personal account in the Fidelity. In Hendricks' personal account, of long standing and active, more than $70,000 of the diverted receivership funds found their way by the check of May 21st, 1931, for $10,000 on the National Newark and Essex Banking Company (9); the check of November 4th, 1931, $10,000, on the receivership account in the Fidelity (3); the seven "H.G. Hendricks Receiver" checks, totaling $39,500 on the Franklin-Washington Trust Company and four "H.G. Hendricks Receiver" checks aggregating $11,000 on the Livingston State Bank.
The "checks missing," of September 30th, 1930, $10,000 (1) and October 15th, 1930, $15,000 (2), deposited in the "H.G. Hendricks Receiver" account in the Franklin-Washington Trust Company (not here in litigation), and the seven retransfer checks on the "H.G. Hendricks Receiver" account in the Franklin-Washington Trust Company, totaling $39,500, deposited in Hendricks' personal account in the Fidelity, are pointed to by the complainants as bringing home knowledge of the shift of receivership funds, and because the Fidelity had a copy of the order giving Hendricks power to sign checks, which also directed that receivership accounts be kept in the name of both receivers, it was aware of Hendricks' fraudulent scheme and of the unlawful diversion of the funds. (It was disputed at the trial that the two "checks missing" were drawn on the Fidelity, but corresponding items in the receivership account in that bank, and there being no like items in any of Hendricks' other accounts, are satisfying that they were.) It is not borne in upon us just how these facts have any greater probative value of bad faith than, for instance, this bank crediting to Hendricks' personal *Page 282 
account the $10,000 check (3) on the receivership account, and that is not censurable under the statute.
Modern banking methods disclose that no one employe of a bank with ordinary volume of business, whatever his position, knows the checks deposited and also the checks of withdrawal of any single depositor. Some one may know either, but not both; not even the bookkeeper of the depositor's account. To illustrate: The bookkeeper of the Earl Radio Corporation receivership account knew the withdrawals, for he had before him the checks from which to make the charges against the account on the loose leaf ledger sheet — in this instance the three checks (1-2-3). Assuming that the same bookkeeper had charge of Hendricks' personal account, which is not likely, he had no knowledge whence came the deposited checks ($70,000) for, after the teller receives a check and deposit slip, a "marker" stamps on the slip the clearing house number of the payor bank, which is passed on to the bookkeeper who enters the credit from the deposit slip which carries no information other than the amount of the deposit and the clearing house number of the payor bank. After leaving the marker the check and others on the same bank are assembled and with others on other banks, forwarded to the clearing house. One force of clerks sees deposited checks, another the withdrawal checks; neither sees both. Now, when it is considered that daily, in the Fidelity, there are two thousand withdrawals and nearly as many deposits, that one hundred employes, including seven tellers, are employed in this work, all under pressure, with minds and eyes on genuineness, not virtue, of checks, and that, perhaps, none saw more than three or four of the checks deposited by Hendricks, and then but at a glance, and weeks and months apart and not recalling, it is demonstrated to the point of certainty that among the million and more like items in the course of the year, the fifteen tainted checks did not attract attention or suggest misappropriation to any one of them, or to the bank a breach of trust. And that was the experience in all the banks.
The complainants protest that "the statute certainly does not intend that a bank is not `bound to inquire' when checks *Page 283 
of this kind and nature are presented to it by a fiduciary for credit to his personal account, nor to change the general banking practice of requiring a copy of the court order of appointment, in opening a receivership account." (There is no such general banking practice.) The statute does intend that very thing, as did the common law. The commissioners give the key: "The general purpose of the act is to facilitate the performance by fiduciaries of their obligations, rather than to favor any particular class of persons dealing with fiduciaries. In order to prevent occasional breaches of trust, the courts have sometimes adopted rules which can easily be evaded by a dishonest fiduciary, but which seriously hamper honest fiduciaries in the performance of their obligations." 9 U.L.A. 148. "To place the burden of supervising upon a bank deposit would be unreasonable and one which few institutions, if any, would be willing to assume; indeed, it would be unbearable, and to do so would in many cases deprive all fiduciaries of banking privileges and work a detriment to estates and fiduciaries generally." United StatesFidelity and Guaranty Co. v. Home Bank for Savings, supra. The policy underlying the common law rule is succinctly given inCocke's Adm'r v. Loyall (Va. 1928), 143 S.E. Rep. 881.
"Banks are essential factors of modern business life. A tremendous and increasing proportion of the business of the country is transacted through them. Their primary function is to guard not their depositors but their deposits, and in the exercise of this function they should be held to a strict accountability. This is required by reason and by law. Beyond this sphere their actions should be measured by the same rules as measure the actions of others. Any other standard would be artificial, or at least discriminatory. Their usefulness would not be extended, but they would be hampered in their proper sphere by diverting their energies and requiring them to act as sureties for and overseers over those with whom they deal; nor does it seem to me that any sound policy requires them to do so. To hold them liable when they have received no benefits nor violated any contract, express or implied, would be to measure their acts by more stringent rules than are applied to others." *Page 284 
The complainants submit that proof of bad faith of the banks is to be found on the face and in the size of the checks, and in their awareness of Hendricks' manoeuvering of funds from receivership accounts into his personal accounts; not that any one employe of a bank was aware, but that Hendricks' mischief, as it has now been unfolded after long and painstaking research by accountants, was, to use their own phrase, to the "composite knowledge" of the bank.
No ground is perceived upon which to except from the principles of the common law, as laid down by the authorities and by the rule of the Fiduciaries act, a fiduciary's check because of the largeness of the amount, and no adjudication has been brought to our attention indicating that it is a badge of fraud.
The "composite knowledge" theory of liability would be deserving of consideration if the doctrine of constructive notice were applicable, and the standard of due care or negligence were the test of responsibility. It might well be that then the banks could not escape because, as some of them argue, in the magnitude of business no one employe of a bank had, or in the ordinary course of his work, could have had, knowledge of what was happening; for, in that circumstance, the several bits of knowledge of employes would in law be imputable to the bank. But bad faith cannot be predicated upon imputed knowledge of fragmentary facts; it cannot be evolved from a "composite knowledge," i.e., notice in legal contemplation. Professor Scott, in his article "Participation in a Breach of Trust," 34Harvard Law Review 450, 481, sums it up in these words: "It must be remembered that the processes of receiving deposits and paying checks are processes in which many employes of the bank take each his separate part. If no one of the employes has knowledge of any breach of trust the bank should not be held liable merely because it appears that at some stage by piecing together all the facts known to different employes a breach of trust would become more or less apparent. The bank is in no way to blame for receiving deposits or allowing withdrawals merely because all the facts known to several *Page 285 
employes would if known to one employe, have aroused a suspicion of misconduct by the depositor. The bank it is submitted should not be liable unless some officer or employe had actual knowledge of the depositor's misconduct or knowledge of facts so clearly indicating such misconduct as to show that the bank was guilty of bad faith."
As additional evidence of bad faith, the complainants refer to and emphasize other happenings:
On the day the $10,000 check of May 21st, 1931, on the National Newark and Essex Banking Company (9) was deposited by Hendricks in his personal account in the Fidelity, he drew a check for $15,375.92, to "cash" and deposited it in the same bank to his credit as receiver of the Interstate Title Examiner Company, Incorporated. It is surmised he was short that much in that receivership, but the suggested implication, that the shortage was made good out of the deposit does not follow, for the bank's record shows that there were more than $10,000 left in the account after the withdrawal was made.
The check of $15,000 of July 3d 1931, on the "H.G. Hendricks Receiver" account in the Franklin-Washington Trust Company, was placed to Hendricks' personal account in the Fidelity without his endorsement. The bank's endorsement in lieu, "absence of endorsement guaranteed," was a matter between the banks and suggests faith in Hendricks rather than suspicion that he was breaching his trust.
On August 28th, 1931, Hendricks drew a check for $6,000 on the "H.G. Hendricks Receiver" account in the Franklin-Washington Trust Company and deposited it in the personal account in the Fidelity. It was returned unpaid and a charge slip was left with his vouchers, reading: "We charge your account with the following items returned unpaid. Drawer, H.G. Hendricks, Rec. — Reason ins. funds $6,000." Hendricks made a deposit of $2,124, which left him a balance. True, this brought notice to the bookkeeper of the personal account that the "H.G. Hendricks Receiver" account was overdrawn, but whether accidentally or through stress, there was no inquiry, the check having been promptly redeemed. *Page 286 
It was this misplay of Hendricks that caused an official of the Franklin-Washington Trust Company to telephone Mr. Baldwin of the National Newark and Essex Banking Company, calling attention to deposits of large sums to its "H.G. Hendricks Receiver" account, from that and other banks. The latter summoned Hendricks to be informed as to his power to draw checks upon Earl Radio Corporation receivership accounts on his single signature (the bank evidently had not a copy of the order) and, being assured by him, telephoned the Fidelity for confirmation, which was given. The complainants' insistence that this sounded an alarm of Hendricks' malfeasance, and that the Fidelity in thereafter crediting to Hendricks' personal account the check of $10,000 on the receivership account in the Fidelity, was in bad faith, is strained. The inquiry of Mr. Merz, vice-president of the Fidelity, was solely as to Hendricks' authority. There was no intimation that he had abused it; Merz knew nothing of the switching of checks or that one had been returned dishonored.
On July 28th, 1931, a check on the "H.G. Hendricks Receiver" account in the Franklin-Washington Trust Company for $6,000 was deposited to Hendricks' personal credit in the Fidelity. The check had been drawn for $6.00, obviously in error and apparently filled out by a clerk. Hendricks corrected it to $6,000. If there was irregularity, we fail to see its pertinency.
The remaining point raised by the complainants is that at times receivership funds deposited by Hendricks in his personal accounts paid overdrafts on those accounts and that the payments were acts amounting to bad faith. In the Fidelity there appear to be three instances involving $20.36, $284.29 and $746.71, and in the Franklin-Washington Trust Company three items of a total of $2,312.13. That deposits had the effect of wiping out the overdrafts, in the absence of a showing that the benefit to the banks was designed and intended, cannot be regarded as acts amounting to bad faith. Lord Westbury in Gray v. Johnston,supra, speaking of a similar payment of an overdraft says: "But it is impossible, *Page 287 
I think, to credit the statement that this was a payment intended to be for the benefit of the bankers, or that it was made by any collusion or fraudulent agreement between the bankers and the executrix in order that the bankers might derive a personal benefit therefrom. That being so, it was a payment in the ordinary way of trade in common discharge of the ordinary duty between a banker and his customer, and it is impossible for the parties interested in the estate to follow that transaction to stamp it with the character of fraud, and to make out that the payment was any other than what it appears to have been, namely, a payment in the ordinary course of trade, and to pursue it as having a different character, the character, namely, of a payment made collusively and fraudulently by the executrix for the personal benefit of the bankers." Lord Cairns expressed the same view, as did Judge Byrne, in Coleman v. Bucks and Oxon UnionBank L.R. (1897), 2 Ch. 243. The proof of benefit to the banks has here no relevancy except as it may bear upon the question of bad faith. Were the bill one of following the res
and the items within the scope of the pleadings and a recovery sought on the ground that the complainants' equity in the funds was superior to the banks, a different question would be up for decision, although it would appear from the cases just cited that even on such a bill there could be no recovery. In connection with the argument that payments of the overdrafts out of receivership funds amounted to bad faith, the complainants urge that the banks were charged with notice and put upon inquiry as to all checks on receivership funds thereafter honored by them, and they rely upon the holding to that end in Bischoff v.Yorkville Bank, supra. There the executor paid the bank a specific sum designed and intended to pay his personal debt. The doctrine of the Bischoff Case has received little encouragement in other jurisdictions. Maryland Casualty Co. v. City NationalBank, supra; Massachusetts Bonding and Insurance Co. v.Standard Trust and Savings Bank, supra. The opposite view was entertained in Gray v. Johnston, supra, and our court of errors and appeals in Rice v. Barrington, supra, held, in substance, that knowledge *Page 288 
of prior fraudulent conduct was at most a suspicious circumstance as regards a subsequent transaction and that proof of circumstances calculated merely to arouse suspicion will not defeat recovery." See, also, Allen v. Puritan Trust Co.,supra. But sound or not the deviation in the Bischoff Case has been ironed out by sections 7, 8 and 9 of the Fiduciaries act, according to the commissioners' notes in 9 U.L.A. 154, the purpose of which they say was to abolish certain exceptions or limitations, and they refer to the departure in the BischoffCase.
Some of the banks object that the complainants have an adequate remedy at law; others, that they are not entitled to subrogation. Had the complainants suffered damage through bad faith of the banks, they would have been entitled to subrogation — a pure equity, enforcible in equity only. Fidelity and Deposit Companyof Maryland v. Queens County Trust Co., supra; MassachusettsBonding and Insurance Co. v. Standard Trust and Savings Bank,supra; United States Fidelity and Guaranty Co. v. Union Bankand Trust Co., supra; Central National Bank of Baltimore v.Connecticut Mutual Life Insurance Co., supra. Subrogation was denied for want of a superior equity in the surety where the cause of action was carelessness. National Surety Co. v. StateSavings Bank, 156 Fed. Rep. 21; Northern Trust Co. v.Consolidated Elevator Co., 142 Minn. 132; American Surety Co.
v. Citizens National Bank, 294 Fed. Rep. 609, and John A.Cozzone Co. v. Earl Radio Corp., 114 N.J. Eq. 436.
The bill will be dismissed. *Page 289