MILTON KAUFMAN, substituted administrator *cum testamento annexo* of estate of Isidore Kaufman, deceased, complainant-respondent,

*v.*

THE TRUST COMPANY OF NEW JERSEY, a corporation, defendant-appellant.

[Argued May 28th, 1941. Decided October 20, 1941.]

*Messrs. Carey & Lane (Mr. Harry Lane,* of counsel), for the complainant-respondent.

*Mr. John Drewen (Messrs. Drewen & Nugent,* of counsel), for the defendant-appellant.

The opinion of the court was delivered by

COLIE, J.

Appellant, The Trust Company of New Jersey, hereinafter referred to as Trust Company, appeals from a final decree of the Court of Chancery, entered upon the advice of Vice-Chancellor Egan, that it pay to Milton Kaufman, substituted administrator *cum testamento annexo* of the estate of Isadore Kaufman, deceased, the sum of $37,085.22 with interest and taxed costs including a counsel fee of $1,000.

The theory of the bill of complaint was dual. It sought to hold the Trust Company (a) as a trustee for the unlawful

conversion of certain shares of stock of the estate; (b) for permitting Blohm, executor of the estate of Isidore Kaufman to withdraw estate funds with knowledge on its part that such funds were being withdrawn for the purpose of misappropriating them.

In 1913 Isidore Kaufman died leaving a last will and testament in which one Goldman and Blohm were named executors and trustees. Goldman renounced and letters testamentary were issued to Blohm who qualified and took possession of the entire estate. Blohm thereupon opened an account in the Trust Company in the name of "Estate of Isidore Kaufman, by Charles H. Blohm, Executor," in which he deposited the estate moneys. Blohm maintained his personal accounts in said Trust Company. In December, 1935, Blohm interviewed one of the Trust Company's officers named Fanning; told Fanning that he needed $4,000 to make repairs to the estate's properties; exhibited to him a copy of the last will and testament of Isidore Kaufman, which Fanning examined and from which he concluded that Blohm had the right to pledge the stock of the estate as collateral for a loan for estate purposes. The Trust Company granted the loan and took as collateral security therefor 100 shares of Underwood Elliott Fisher Company and 100 shares of General Cigar Company stock. In January, 1936, Blohm borrowed additional sums of $3,000 and $5,000 against the aforementioned collateral and gave his demand note as executor for the total of $12,000. This sum of $12,000 was credited to the estate account. In the same month, the Trust Company, at Blohm's request, transmitted to brokers an order to sell the 100 shares of General Cigar. The stock was sold for $14,075.71, of which $12,036 went to the bank to pay off the $12,000 note, together with an interest charge of $36 and the balance of $2,039.71 was deposited in the estate account. During February and March, 1936, at the request of the executor the Trust Company transmitted to the broker a direction to sell the Underwood Elliott Fisher stock. This order was executed and the proceeds of sale, totaling $13,265.21 were also deposited in the estate account. In July, 1936, again at the instance of the executor, the

Trust Company sold through the same broker the Goodrich stock, receiving $9,744.80 therefor, which also went into the estate account. The Goodrich stock was turned over to the Trust Company to be forwarded to the broker and it was never in the hands of the Trust Company for any other purpose. Commencing on December 26th, 1935, and continuing into August of the next year, the executor Blohm, drew some fifteen checks on the estate account, aggregating $36,600, all but three of which were endorsed and deposited in Blohm's attorney's account. As to the three checks which were not so endorsed and deposited, there is no evidence to indicate what disposition was made of them. Thereafter, the funds deposited in the attorney's account were, from time to time, withdrawn by Blohm, until the account was closed out in November of 1936. During the period when Blohm was acting as executor of the Kaufman estate, he personally was indebted to the Trust Company in the sum of approximately $70,000. It was in evidence that Blohm was an attorney-at-law, formerly with a substantial real estate practice; that he was unable to keep up payments of interest and principal on his own indebtedness, and the Trust Company made an arrangement with him by which the interest rate was reduced and payments of reduced interest were applied in reduction of the principal of the loan.

Blohm, the executor, died by his own hand on May 11th, 1939, a substituted administrator *cum testamento annexo,* Milton Kaufman, was appointed, the embezzlement of the estate funds was discovered and the bill of complaint filed.

In so far as the bill of complaint is grounded on an unlawful conversion of the stocks, it must fall. The Underwood Elliott Fisher and General Cigar stocks were pledged as collateral and they remained as collateral in the possession of the Trust Company until January, 1936, when the $12,000 loan was discharged from the proceeds of the sale of the General Cigar stock. The one block of stock ceased to be collateral when it was sold. The other ceased to be collateral when the loan, as security for which it was pledged, was paid off. From that point, the Underwood Elliott Fisher stock and the Goodrich stock, which latter had been turned over to

the Trust Company but never pledged as collateral, were in the possession of the Trust Company as custodian. It was nothing more than a conduit through which the sales and deliveries of the shares to the broker were effectuated. The allegation of an unlawful conversion, assuming *arguendo* that there was an unlawful conversion, and we do not intimate that there was, was *damnum absque injuria,* and that, because the proceeds of the sales of all the stocks were used in payment of the debt of the estate or were deposited to the credit of the estate, with the exception of a small item of $36 for interest.

The loss sustained by the Kaufman estate did not arise from the borrowing of the executor and the pledging of the stocks as collateral, nor did it arise from the sale of the shares, it occurred when Blohm misappropriated the funds.

To hold the Trust Company liable for the defalcations of the executor it was incumbent upon the complainant below to establish that the Trust Company knowingly participated in the embezzlement or had knowledge of such facts that its honoring of the checks drawn by the executor amount to bad faith. In an endeavor to establish bad faith, it is urged that because Blohm was personally indebted to the Trust Company and was unable to keep up the payments of interest and principal, that such fact put the Trust Company upon notice that Blohm was a potential thief. Such an inference carries cynicism beyond reason and is wholly untenable.

Since there arises no inference of Blohm's dishonesty from his inability to make payments on his personal indebtedness, there remains no evidence that the Trust Company or any officer thereof had knowledge that the funds were being misappropriated.

The immunity of a bank under like circumstances has been established by a long line of decisions and the pronouncements of leading authorities some of which are cited below. *Central National Bank of Baltimore* v. *Connecticut Mutual Life Insurance Co., 104 U. S. 54; Stark* v. *National City Bank, 278 N. Y. 388; Goodell* v. *Monroe, 87 N. J. Eq. 328; New Amsterdam Casualty Co.* v. *National Newark and Essex Banking Co., 117 N. J. Eq. 264; affirmed, 119 N. J. Eq.*

*540; 4 Bogert on Trusts and Trustees 2635 § 910; 3 Scott on Trusts 1776 § 3266.*

Finally the question is definitely set at rest by the Uniform Fiduciaries Law, *R. S. 1937, 3:44-9:*

"If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal, if he is empowered to draw checks thereon, or of checks payable to his principal and endorsed by him, if he is empowered to endorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith."

Vice-Chancellor Backes, in *New Amsterdam Casualty Co. v. National Newark and Essex Banking Co., supra,* speaking of this statutory provision said: "Section 9 is an extension of the immunity to banks receiving fiduciaries' checks for deposit to their personal account and honoring their personal checks thereon, unless they have knowledge of the breach of trust or act in bad faith. The standard of due care or negligence and the doctrine of constructive notice in respect of bank deposits of fiduciary funds find no recognition in the Fiduciaries Act. It definitely declares bad faith to be the test of liability. That was the rule at common law, and the statute but embodies the common law rule, making uniform its application and realigning whatever deviations it may have fallen into."

The decree of the Court of Chancery appealed from is reversed and the bill dismissed.

*For affirmance*—PERSKIE, WOLFSKEIL, JJ. 2.

*For reversal*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PORTER, COLIE, DEAR, WELLS, RAFFERTY, THOMPSON, JJ. 12.