723 A.2d 994

NEW JERSEY TITLE INSURANCE COMPANY, PLAINTIFF–APPELLANT, v. JOSEPH C. CAPUTO AND TRUMP TAJ MAHAL ASSOCIATES (D/B/A TRUMP TAJ MAHAL CASINO RESORT AND IMPROPERLY PLED AS TAJ MAHAL HOTEL AND CASINO), DEFENDANTS, AND NEW JERSEY NATIONAL BANK, SUCCESSOR IN INTEREST TO CORESTATES BANK, CONSTELLATION BANK, AND THE NATIONAL STATE BANK, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 21, 1999—Decided February 19, 1999.

312

Before Judges BAIME, A.A. RODRIGUEZ and KIMMELMAN.

*James M. Cutler,* argued the cause for appellant (*Stern, Lavinthal, Norgaard & Kapnick,* attorneys; *Walter E. Thomas, Jr.* and *Mr. Cutler,* of counsel; *Mark A. Trudeau,* on the brief).

*John D. North,* argued the cause for respondent (*Greenbaum, Rowe, Smith, Ravin, Davis & Himmel,* attorneys; *Mr. North* and *Jodi L. Rosenberg,* on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

Joseph Caputo, a lawyer, embezzled loan funds that had been deposited in his attorney trust account at National State Bank (National Bank).[1] The loan funds had been earmarked for the payment of mortgages on properties purchased by Caputo's clients. New Jersey Title Insurance Company (New Jersey Title) paid the mortgages and sued National Bank, contending that the bank had acted in bad faith by permitting Caputo to withdraw funds in cash or by certified check payable to himself from his attorney trust account. The Law Division granted National Bank's motion for summary judgment. New Jersey Title appeals. We affirm.

I.

The salient facts are not in dispute. Caputo maintained two accounts with the Summit branch of National Bank, an "attorney trust account" and an "attorney business account." A substantial portion of Caputo's legal practice involved real estate closings. New Jersey Title designated Caputo as a closing agent and issued "closing protection letters" protecting mortgage lenders against any misappropriation of funds by the lawyer. Caputo received loan funds from the buyers' mortgage lenders and deposited them in his attorney trust account. These monies were to be used to satisfy the sellers' mortgages on the properties purchased by Caputo's clients. Instead, over a three month period, Caputo issued fifty-eight checks totaling $291,350 payable to himself and drawn on his attorney trust account. Copies of the checks appear

---

[1] New Jersey National Bank is the successor in interest of National State Bank.

in the appendix to New Jersey Title's brief. Unfortunately, these copies are largely illegible. However, in the bottom "memo" portion of the checks, Caputo generally wrote "fees" or "costs."

Much of the record pertains to Caputo's practices in misappropriating his clients' funds. Caputo would have National Bank either certify or cash the checks. The proceeds would be used for gambling, principally at Trump Taj Mahal Hotel and Casino. When Caputo chose not to bring cash to Atlantic City, his practice was to transmit, by facsimile, copies of the certified checks to the casino. On occasion, the casino would make inquiry as to the validity of the certified check. Such an inquiry would be forwarded to a teller who would confirm that the check had been certified. It was not necessary to confirm the account balance because it was incumbent on the bank to honor certified checks absent exceptional circumstances. In his deposition, Caputo testified that in order to avoid suspicion, he would draw multiple checks in amounts of $2,500 or less.

Veronica Kane was the manager of the Summit branch of National Bank and Catherine Martin the assistant manager. Both individuals knew generally that Caputo gambled at casinos in Atlantic City. Caputo once told Martin that he had received a large settlement and intended to drive to Atlantic City "to see if [he] could win." Kane also recalled a similar conversation with Caputo. Because Caputo's checks were drawn in relatively large amounts, either Kane or Martin was required to approve them. Kane and Martin knew that an attorney trust account consisted largely of clients' funds. However, they did not know that an attorney cannot ethically cash attorney trust account checks and use the proceeds for personal benefit. As noted in the proceedings below, it was assumed that fees could be paid out of the attorney trust account whether or not deposited in the attorney business account.

As time passed, both Kane and Martin became "suspicious" of Caputo's activities. However, contrary to New Jersey Title's contention, these suspicions did not concern the possibility that

Caputo was misappropriating clients' funds. Instead, Kane and Martin were concerned that Caputo was attempting to evade Internal Revenue Service reporting regulations by drawing multiple checks. They also questioned Caputo's failure to open "sub-accounts" for his clients in the attorney trust account and his numerous withdrawals of cash using Atlantic City MAC machines, which caused substantial overdrafts in the attorney business account. These considerations led Kane and Martin to close Caputo's attorney business account shortly before the lawyer's defalcations came to light.

On January 21, 1994, New Jersey Title filed a verified complaint and order to show cause against National Bank and Caputo. On the same date, the Law Division enjoined the bank from disbursing any funds from Caputo's attorney trust account. The order was received by National Bank on January 24, 1994. We add that contrary to New Jersey Title's factual statement in its brief, National Bank faithfully complied with the restraining order in all respects. New Jersey Title's complaint was later amended to include Taj Mahal as a defendant.

A voluntary dismissal was subsequently entered with respect to Taj Mahal. A default judgment was entered against Caputo, who was convicted of embezzlement and disbarred. *In re Caputo,* 135 *N.J.* 106, 638 *A.*2d 805 (1994). The Law Division initially denied National Bank's motion for summary judgment, but subsequently granted the bank's renewed application. In her oral opinion, Judge Russell concluded that National Bank was immune from liability under the Uniform Fiduciaries Law (*N.J.S.A.* 3B:14–52 to 65) because it did not have "actual knowledge" of Caputo's breach of duty and did not act in "bad faith." It is against this factual backdrop that we examine the issues presented.

II.

We begin our analysis with the Uniform Fiduciaries Law. *N.J.S.A.* 3B:14–55 provides in pertinent part:

If a check . . . is drawn by a fiduciary as such or in the name of his principal by a fiduciary empowered to draw the instrument in the name of his principal, payable to the fiduciary personally, . . . and is thereafter transferred by the fiduciary,

> whether in payment of a personal debt of the fiduciary or otherwise, the transferee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary ... and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary *unless he takes the instrument with actual knowledge of the breach or with knowledge of facts that his action in taking the instrument amounts to bad faith.*
>
> [*Ibid.* (emphasis added).]

The Uniform Fiduciaries Law does not contain a definition of "bad faith." However, *N.J.S.A.* 3B:14–53(e) states that "[a] thing is done 'in good faith' ... when it is in fact done honestly, whether it be done negligently or not." *Ibid.*

The Uniform Fiduciaries Law was enacted in 1981. *L.* 1981, *c.* 405. The predecessor statute, the Uniform Fiduciaries Act (*L.* 1927, *c.* 30), similarly rendered a bank immune from liability in honoring a fiduciary's check "unless the bank pa[id] the check with actual knowledge that the fiduciary [was] committing a breach of his obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amount[ed] to bad faith." *N.J.S.A.* 3A:41–7 (repealed 1981). Like the Uniform Fiduciaries Law, the Uniform Fiduciaries Act gave no definition of "bad faith."

In *New Amsterdam Cas. Co. v. National Newark & Essex Banking Co.*, 117 *N.J. Eq.* 264, 175 *A.* 609 (1934), *aff'd*, 119 *N.J. Eq.* 540, 182 *A.* 824 (E. & A.1935), Vice–Chancellor Backes traced the genealogy of the bank immunity provision to the early common law of England. *Id.* at 271–72, 175 A. 609. While noting that the statutory reference to "bad faith" constituted "an indefinite term," the Vice Chancellor emphasized that it "differ[ed] from the negative idea of negligence in that it contemplat[ed] a state of mind affirmatively operating with a furtive design or some motive of interest or ill will." *Id.* at 277, 175 *A.* 609. Bad faith was said to "contain[ ] the element of intent to do wrong in some degree, actual or necessarily inferable." *Ibid.* As phrased by the Vice–Chancellor, "bad faith, with its sinister implications, means knowledge by any responsible agency, officer or employee, or a bank, of an incriminating state of facts, short of actual knowledge of the breach of trust, but conscious of it and aiding and abetting, or acquiescing in the breach." *Id.* at 278, 175 *A.* 609.

The facts of *New Amsterdam* are instructive. The receiver of an insolvent corporation embezzled funds that had been deposited in a receivership account. The plaintiffs charged that the banks upon which the receiver drew the checks and the banks receiving them, paid and accepted the instruments with actual knowledge of the derelictions, or with knowledge of such facts as amounted to bad faith. In several instances, the receiver deposited trust funds in his personal accounts and paid overdrafts owed to the bank. The plaintiffs contended that the checks by which the diversion of the funds was accomplished put the banks on duty to inquire, and consequently the banks should be charged with notice that the receiver was diverting the monies to his personal accounts. They asserted that the amounts of the checks and their designation as receivership account drafts should have put the bank on notice of the receiver's defalcations. In advancing this contention, the plaintiffs argued that while no one employee of the bank was fully aware of the receiver's misappropriations, their "composite knowledge" was sufficient to establish constructive notice. *Id.* at 284, 175 *A.* 609.

The Vice–Chancellor was unpersuaded by the plaintiffs "composite knowledge" theory of liability. Citing the Uniform Fiduciaries Act, the Vice–Chancellor concluded that principles relating to "constructive notice" were inapplicable. *Ibid.* In reaching this conclusion, the Vice–Chancellor reasoned:

> The standard of due care or negligence and the doctrine of constructive notice in respect of bank deposits of fiduciary funds finds no recognition in the Fiduciaries Act. It definitely declares bad faith to be the test of liability. That was the rule at common law, and the statute but embodies the common law rule, making uniform its application and realigning whatever deviations it may have fallen into.
>
> [*Id.* at 277, 175 *A.* 609.]

In eschewing the plaintiffs' reliance on "composite knowledge," the Vice–Chancellor emphasized:

> [B]ad faith cannot be predicated upon imputed knowledge of fragmentary facts; it cannot evolve from a 'composite knowledge,' i.e., notice in legal contemplation....'
> It must be remembered that the processes of receiving deposits and paying checks are processes in which many employees of the bank each take his separate part. If no one of the employees has knowledge of any breach of trust the bank should not

be held liable merely because it appears that at some stage by piecing together all the facts known to different employees a breach of trust would become more or less apparent. The bank is in no way to blame for receiving deposits or allowing withdrawals merely because all the facts known to several employees would if known to one employee, have aroused a suspicion of misconduct by the depositor. The bank ... should not be liable unless some officer or employee had actual knowledge of facts so clearly indicating such misconduct as to show that the bank was guilty of bad faith.

[*Id.* at 284–85, 175 *A.* 609.]

The Court of Errors and Appeals affirmed the judgment in favor of the banks, noting that it was "in full accord with the reasoning and conclusions of Vice–Chancellor Backes." *New Amsterdam Cas. Co. v. National Newark & Essex Banking Co.,* 119 *N.J. Eq.* at 541, 182 *A.* 824. The Court nevertheless found it unnecessary to determine the soundness of the view stated in *Perry on Trusts* 177 (7th ed.1924), and incorporated in the Vice–Chancellor's opinion, that, although the depositor's conduct or course of dealing " 'may bring it to the notice of the bank circumstances which would enable it to know that he is violating his trust, such circumstances do not impose upon the bank the duty or give it the right to institute any inquiry into the conduct of its customer, in order to protect those for whom the customer may hold the fund, but between whom and the bank there is no privity.... ' " *Id.* at 541, 182 *A.* 824.

Whatever reservation the Court of Errors and Appeals may have harbored respecting the view expressed by the author of *Perry on Trusts,* no similar equivocation appears in any subsequent decision dealing with the Uniform Fiduciaries Act. In *Kaufman v. Trust Co. of N.J.,* 130 *N.J. Eq.* 346, 22 *A.*2d 279 (E. & A.1941), the Court reaffirmed the principles stated by Vice–Chancellor Backes in *New Amsterdam.* The executor of an estate opened an account in the Trust Company in the name of "Estate of Isidore Kaufman, by Charles H. Blohm, Executor." *Id.* at 347, 22 *A.*2d 279. Among other maneuvers, Blohm drew fifteen checks on the estate account and deposited them in his personal account. At the time of these transactions, Blohm was personally indebted to the Trust Company. Apparently, some of the funds in Blohm's attorney account were used to reduce the amount he owed. The

Vice–Chancellor found that Blohm's transactions should have put the bank on notice that Blohm was embezzling the estate's funds. Judgment was entered in favor of the substituted administrator. The Court of Errors and Appeals reversed, holding that the bank was immune from liability under the Uniform Fiduciaries Act. *Id.* at 350, 22 *A.*2d 279. Citing *New Amsterdam,* the Court stressed that the standard of due care and the doctrine of constructive notice were not applicable "in respect of bank deposits of fiduciary funds." *Ibid.* The Court found no evidence in the record "that the Trust Company or any officer ... had knowledge that the funds were being misappropriated." *Id.* at 349, 22 *A.*2d 279.

The Law Division applied these principles and reached a similar conclusion in *Goldstein v. Commonwealth Trust Co.,* 19 *N.J.Super.* 39, 87 *A.*2d 555 (Law Div.1952). We need not describe in detail the facts of that case. Suffice it to say, a check drawn on an attorney's "special account" was improperly honored. The plaintiffs argued that the labeling of the account was of such a nature as to give notice to the bank that its depositor was a fiduciary, and that the check the bank had honored disbursed monies not belonging to the attorney. In rejecting that argument, the court observed that "special attorneys' accounts may not only contain clients' funds but also funds belonging to the attorneys themselves." *Id.* at 44, 87 *A.*2d 555. The court reasoned, "[t]he best, then, that can be said for the plaintiffs' proposition is that a bank has knowledge that the attorney may be disbursing funds not his own." *Ibid.* Referring to *New Amsterdam,* the court said, "even in a situation where a bank had adequate notice that an account was held by a depositor only in a fiduciary capacity, it has been held that the bank's obligation runs to the trustee-depositor and that it owes no duty to the trust estate save to refrain from participating in misappropriating the funds." *Ibid.*

Applying these principles, we find no sound basis to disturb the result reached by Judge Russell. The fact that the checks were drawn on Caputo's attorney trust account does not indicate that bank employees were aware of the attorney's defalcations. While it is true that Martin, and perhaps Kane, knew that an

attorney trust account contains funds belonging to the lawyer's clients and that attorneys are required to maintain separate business accounts, *see R.* 1:21–6(a)(2), the record is barren of any evidence indicating they had knowledge of the intricacies of an attorney's professional and ethical obligations. While Kane and Martin were concerned about Caputo's "sloppy" bookkeeping practices, neither was aware that the attorney was stealing clients' funds. As pointed out by Judge Russell, Caputo could have accomplished the same misappropriation by drawing checks on his attorney trust account and depositing them into his attorney business account under the subterfuge of taking his permitted fees. As is evident from the deposition testimony of Kane and Martin, the fact that a check may have been drawn from Caputo's attorney trust account did not mean to them that the money was not his. The fact that the money was drawn from Caputo's attorney trust account should not enlarge the bank's responsibilities in an appreciable way. The money could have been Caputo's fees, and it was not the bank's duty to inquire into their origin. Under its IOLTA agreement, National Bank was duty-bound to report any overdrafts in Caputo's attorney trust account. *Ibid.* There were no overdrafts in this account, however. Under the Uniform Fiduciaries Law, National Bank was not otherwise obliged to monitor Caputo's attorney trust account to insure that clients' funds were properly disbursed.

### III.

Although not raised below, New Jersey Title argues that the Uniform Commercial Code, and not the Uniform Fiduciaries Law, governs this case, and that *N.J.S.A.* 12A:3–304(2) requires judgment in its favor. *N.J.S.A.* 12A:3–304(2) provides:

> The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty.
>
> [*Ibid.*]

We will return to this section later in our opinion. We first address New Jersey Title's claim that *N.J.S.A.* 12A:3–304(2), and not *N.J.S.A.* 3B:14–55, is controlling.

The Uniform Commercial Code was enacted in New Jersey in 1961. *N.J.S.A.* 12A:10–105 specifically repealed several sections of the Uniform Fiduciaries Act, but contained no reference to those provisions which were applied in *New Amsterdam.* However, *N.J.S.A.* 12A:10–105 further states that "[a]ll statutes and parts of statutes inconsistent" with the provisions of the Uniform Commercial Code "are repealed." *Ibid.* If, as New Jersey Title contends, the sections of the Uniform Fiduciaries Act applied in *New Amsterdam* are deemed "inconsistent with" *N.J.S.A.* 12A:3–304(2), it would appear that those provisions would fall within the repealer provision of *N.J.S.A.* 12A:10–105. However, in 1981, the Legislature enacted the Uniform Fiduciaries Law, including *N.J.S.A.* 3B:14–55.[2] The statutory language deviates only in minor respects from that contained in the predecessor statute, and encompasses the same "actual knowledge" and "bad faith" standards that were applied in *New Amsterdam* and its progeny.

■■■ The perplexing question is whether the mandate of *N.J.S.A.* 12A:10–105 that statutes or parts of statutes inconsistent "with the provisions of the Uniform Commercial Code are repealed" should be applied *in futuro* to give paramountcy to *N.J.S.A.* 12A:3–304(2) over *N.J.S.A.* 3B:14–55. That in a nutshell is the argument advanced by New Jersey Title. We reject this

---

[2] The Uniform Commercial Code was substantially revised in 1995. Portions of *N.J.S.A.* 12A:304 were modified or repealed. As revised, *N.J.S.A.* 12A:3–307 now pertains to the subject of notice of a breach of fiduciary duty. Subsection (3) provides that "[i]f an instrument is issued by the ... fiduciary as such, and made payable to the fiduciary personally, the taker does not have notice of the breach of fiduciary duty unless the taker knows of the breach of fiduciary duty." *Ibid.* None of the parties has argued that *N.J.S.A.* 12A:3–307 should be given retrospective application. *See South Hamilton Assocs. v. Mayor & Council of Morristown,* 99 *N.J.* 437, 439, 493 *A.*2d 523 (1985); *Gibbons v. Gibbons,* 86 *N.J.* 515, 521–24, 432 *A.*2d 80 (1981); *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 73, 389 *A.*2d 465 (1978); *Skulski v. Nolan,* 68 *N.J.* 179, 202, 343 *A.*2d 721 (1975); *Rothman v. Rothman,* 65 *N.J.* 219, 224–25, 320 *A.*2d 496 (1974); *Keil v. National Westminster Bank,* 311 *N.J.Super.* 473, 482–83, 710 *A.*2d 563 (1998). We thus have no occasion to consider the impact of the revised section on the issues presented.

contention. We read *N.J.S.A.* 12A:10–105 as repealing only those statutes or parts of statutes then in existence that were inconsistent with the Uniform Commercial Code. The more recent enactment, *N.J.S.A.* 3B:14–55, must prevail because it is the later expression of the legislative intent. The Uniform Fiduciaries Law, and not the Uniform Commercial Code, controls this case. *See County of Macon v. Edgcomb,* 274 *Ill.App.*3d 432, 211 *Ill.Dec.* 136, 654 *N.E.*2d 598, 602 (1995).

We thus need not determine the impact of *N.J.S.A.* 12A:3–304(2). We merely note that the comments of the Commissioners on Uniform State Laws state that "[s]ubsection (2) follows the policy of [the] Uniform Fiduciaries Act, and specifies the same elements as notice of improper conduct of a fiduciary." *U.C.C.* 3–304(2), comment 5; *see also Coeur d'Alene Mining Co. v. First Nat'l Bank of N. Idaho,* 118 *Idaho* 812, 800 *P.*2d 1026, 1032 (1990).

Affirmed.