748 A.2d 507

NEW JERSEY TITLE INSURANCE COMPANY, PLAINTIFF–APPELLANT, v. JOSEPH C. CAPUTO AND TRUMP TAJ MAHAL ASSOCIATES D/B/A TRUMP TAJ MAHAL CASINO RESORT AND IMPROPERLY PLED AS TAJ MAHAL HOTEL AND CASINO, DEFENDANTS,NEW JERSEY NATIONAL BANK, SUCCESSOR-IN-INTEREST TO CORESTATES BANK, CONSTELLATION BANK AND THE NATIONAL STATE BANK, DEFENDANT–RESPONDENT.

Argued January 3, 2000—Decided March 22, 2000.

144

*James M. Cutler* argued the cause for appellant (*Stern, Lavinthal, Norgaard & Kapnick,* attorneys).

*John D. North* argued the cause for respondent (*Greenbaum, Rowe, Smith, Ravin, Davis & Himmel,* attorneys).

The opinion of the Court was delivered by

LONG, J.

In this case, we are called upon to define more precisely the standard of bad faith found in the Uniform Fiduciaries Law (UFL), *N.J.S.A.* 3B:14–55 to –61, in the context of an attorney's embezzlement from his clients' trust account.

*I*

During the period from mid-November 1993, to mid-February 1994, Joseph C. Caputo, a New Jersey attorney and sole practitioner, maintained two checking accounts, an attorney trust account and an attorney business account, at the National State Bank (Bank) in Summit.[1]

Real estate constituted a substantial portion of Caputo's legal practice. His involvement with New Jersey Title Insurance Company (NJT) stemmed from several closings in which Caputo represented buyers and NJT insured title. In those transactions, Caputo received the loan funds from the buyers' mortgage-lenders and deposited them into his attorney trust account. He was expected to use those funds to pay off the sellers' mortgages. Instead, within the subject three-month period, Caputo issued 52 checks totaling $291,350, payable to himself out of his account.

---

[1] Other banks have succeeded to the interests of The National State Bank (i.e. Constellation Bank, CoreStates Bank, and now New Jersey National Bank). For this opinion, the term Bank incorporates all of these institutional changes.

Caputo either cashed those checks at the Summit Avenue branch of the Bank, or had them certified at that branch and then cashed them at the Trump Taj Mahal Hotel and Casino in Atlantic City. In either event, Caputo used the proceeds of those checks for casino gambling, primarily at Trump Taj Mahal.

When NJT learned that Caputo had not satisfied the mortgage liens, it began an investigation that uncovered Caputo's embezzlement scheme. NJT paid off the outstanding mortgages, and on January 21, 1994, instituted suit against Caputo. On that date, an order was entered enjoining the Bank from disbursing any funds from Caputo's trust account. Trump Taj Mahal and the Bank were later named as defendants in the law suit. NJT's action against Trump Taj Mahal was eventually dismissed by stipulation. A default judgment was entered against Caputo, who pled guilty to criminal charges relating to the embezzlement and was disbarred by consent. *Matter of Caputo*, 135 *N.J.* 106, 638 *A.*2d 805 (1994).

The action against the Bank was based on the allegation that it had "actual knowledge that ... Caputo's intended use of the trust funds would breach fiduciary duties," and that the Bank was negligent and acted in bad faith in violation of *N.J.S.A.* 3B:14–55.

The Bank denied the allegations of the complaint, contending that NJT's action was "barred under the provisions of the Uniform Fiduciaries Law, *N.J.S.A.* 3B:14–52 [to –65], because the Bank lacked actual knowledge of the alleged breaches of fiduciary obligation by Caputo, and lacked knowledge that its certification or payment of the checks amounted to bad faith." The Bank thereafter moved for summary judgment.

The facts adduced on the motion are not in dispute. During the three relevant months, Caputo embezzled over $291,000 in client funds. In the one month period between December 18, 1993, and January 21, 1994, Caputo drew fifty-two trust account checks payable to himself as follows:

| Date | Amount | #of checks |
|------|--------|------------|
| 12/18/93 | $ 5,000 | 1 |
| 12/20/93 | $ 14,600 | 3 |
| 12/21/93 | $ 5,000 | 1 |
| 12/22/93 | $ 8,000 | 2 |
| 12/23/93 | $ 10,000 | 2 |
| 12/24/93 | $ 7,500 | 2 |
| 12/28/93 | $ 16,000 | 3 |
| 12/29/93 | $ 5,000 | 1 |
| 12/30/93 | $ 32,300 | 7 |
| 12/31/93 | $ 4,000 | 1 |
| 1/02/94 | $ 4,800 | 1 |
| 1/03/94 | $ 4,800 | 1 |
| 1/05/94 | $ 10,000 | 2 |
| 1/06/94 | $ 8,600 | 2 |
| 1/07/94 | $ 8,000 | 2 |
| 1/10/94 | $ 5,000 | 1 |
| 1/11/94 | $ 5,500 | 1 |
| 1/12/94 | $ 5,000 | 1 |
| 1/13/94 | $ 17,000 | 3 |
| 1/14/94 | $ 24,500 | 5 |
| 1/19/94 | $ 15,500 | 4 |
| 1/21/94 | $ 25,250 | 6 |
| **TOTAL:** | $241,350 | 52 |

On a weekly basis these transactions broke down to $45,000 (12/20/93), $57,300 (12/27/93), $36,000 (1/3/94), $57,000 (1/10/94) and $40,750 (1/17/94) respectively.

Because of the amounts involved, each of the fifty-two checks Caputo drew was authorized by Branch Manager Veronica Kane or Assistant Branch Manager Kathy Martin. Kane and Martin were the only platform officers in that small branch bank. Both Kane and Martin admitted that they knew an attorney's trust account contains client funds and that they were aware of Caputo's gambling. More particularly, Kane knew from studying large ATM withdrawals from Caputo's business account (which was frequently overdrawn during the subject period) that he was spending a considerable amount of time in Atlantic City and was depositing money from his trust account

into his business account and then going to Atlantic City and withdrawing it or he would write checks in large amounts and I would question what it was for and he always came up with a reason, "It's for a client. I have a closing." I didn't know how far I could go in questioning him what he was doing with his money.

Kane was suspicious when Caputo's business account was overdrawn despite the fact that he made large deposits. She said that she had more than one conversation with Martin to discuss closing Caputo's trust account based on her suspicions. Kane learned from her investigation that Caputo never followed the correct procedure in opening sub-accounts in his trust account for his clients, and she threatened to close the trust account on that basis. Kane said that, after speaking with Martin, they both felt that the business and trust accounts should be closed because Caputo did not open sub-accounts for his clients and because of the ATM withdrawals at the casinos. Both Martin and Kane denied knowing anything about Caputo's embezzlement until a judge entered an order enjoining the use of Caputo's trust account.

Martin did acknowledge, however, concerns that Caputo was engaging in tax evasion. Martin testified that cashing more than $10,000 in checks in a week should have resulted in the issuance of a cash transaction report (CTR) to the Internal Revenue Service. Although Caputo's weekly totals were generally *five* times the allowable amount and, in fact, on nine occasions, Caputo met or exceeded the allowable weekly total in just one day, no explanation was offered for failure to file any such report, even though this omission could clearly facilitate tax evasion.

The Bank closed Caputo's business account on January 20, 1994, because of the overdrafts, the gambling, and because "it was not satisfied with the way he was conducting business." The Bank nevertheless allowed Caputo to cash a $25,000 trust account check the following day.

During discovery, NJT produced an expert who expressed the opinion that a reasonable jury could conclude that the Bank was willfully ignorant of facts and circumstances surrounding Caputo's transactions such that its paying, cashing, and certifying the checks constituted bad faith.

The Bank moved for summary judgment. The trial judge ruled that the Bank "was immune from liability under the Uniform Fiduciaries Law because it did not have 'actual knowledge' of Caputo's breach of duty and did not act in 'bad faith.'" *New Jersey Title Ins. Co. v. Caputo*, 318 *N.J.Super.* 311, 315, 723 *A.*2d 994 (App.Div.1999).

The Appellate Division affirmed the grant of summary judgment. *New Jersey Title, supra*, 318 *N.J.Super.* at 322, 723 *A.*2d 994. We granted certification, 161 *N.J.* 150, 735 *A.*2d 575 (1999), and now reverse.

## II

The UFL provides in relevant part:

If a check ... is drawn by a fiduciary as such or in the name of his principal by a fiduciary empowered to draw the instrument in the name of his principal, payable to the fiduciary personally, ... and is thereafter transferred by the fiduciary, whether in payment of a personal debt of the fiduciary or otherwise, the transferee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary *unless he takes the instrument with actual knowledge of the breach or with knowledge of facts that his action in taking the instrument amounts to bad faith.*

[*N.J.S.A.* 3B:14–55 (emphasis added).]

The UFL's predecessor, the Uniform Fiduciaries Act, *N.J.S.A.* 3A:41–1 to –14(UFA) likewise provided, among other things, that a bank would be immune from liability in honoring a fiduciary's check "unless the bank pa[id] the check with actual knowledge that the fiduciary [was] committing a breach of his obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amount[ed] to bad faith." *N.J.S.A.* 3A:4–7. The Uniform Commercial Code (UCC) specifically repealed parts of the UFA in 1961 (*N.J.S.A.* 12A:10–105), but did not repeal *N.J.S.A.* 3A:41–6 or 7, the provisions on which the UFL is modeled. Thus, the standard for bank liability in the fiduciary setting has been the same for over seven decades. That is important because most of the cases interpreting the bad faith standard were decided prior to the 1981 codification.

In this case, it is not alleged that the Bank had actual knowledge that Caputo was embezzling client funds. Nor is this a "constructive notice" case. NJT is not advancing a claim based on unrelated bits of knowledge within the ken of different employees. It contends that the facts actually known by Kane and Martin were such that it was bad faith not to inquire further of Caputo.

The issue is whether the evidence, viewed in the light most favorable to NJT, would permit a rational fact finder to resolve the disputed question of bad faith in its favor. If so, summary judgment on behalf of the Bank was unwarranted. The outcome here depends on the meaning of the bad faith language in the act.

### III

We begin our analysis with the words of the statute which plainly provide two circumstances in which the institution is bound to inquire and may be chargeable with notice of the fiduciary's misdeeds: (1) where it actually knows of the breach of the fiduciary's obligation and (2) where it knows of facts such that its action in taking the instrument amounts to bad faith. These are two entirely different standards. Under the former, the Bank is liable if it is actually aware that the fiduciary is misappropriating. In such a case, it takes the instrument as an accomplice or participant in the breach. The latter standard obviously requires something less than actual knowledge or it would be a mere superfluity. Exactly how much less is the question.

The earliest decision on this subject was rendered in *New Amsterdam Cas. Co. v. National Newark & Essex Banking Co.*, 117 *N.J. Eq.* 264, 265–67, 175 *A.* 609 (N.J.Ch.1934), *aff'd*, 119 *N.J. Eq.* 540, 182 *A.* 824 (E. & A.1935). In that case, the UFA was applied to a receiver who embezzled $149,000 by drawing checks to himself and depositing the funds in different personal accounts. A suit by the entity in receivership alleged that the bank paid and received checks, which put it on notice that funds were being diverted from the receivership to the receiver's personal accounts to pay the receiver's personal overdrafts and other debts. *Id.* at

270, 175 *A.* 609. Although bad faith was not defined in the UFA, good faith was defined as a thing "done honestly, whether it be done negligently or not." *N.J.S.A.* 3A:41–1. Thus, the Vice Chancellor in *New Amsterdam* observed that "conversely bad faith must be a thing done when it is in fact done dishonestly." *New Amsterdam, supra,* 117 *N.J. Eq.* at 277, 175 *A.* 609. Differentiating bad faith from negligence, he described the former as contemplating "a state of mind affirmatively operating with a furtive design or some motive of interest or ill will." 117 *N.J. Eq.* at 277, 175 *A.* 609. More particularly, he stated:

> Read in the light of its statutory context, bad faith, with its sinister implications, means knowledge by any responsible agency officer or employee, of a bank, of an incriminating state of facts, short of actual knowledge of the breach of trust, but conscious of it and aiding and abetting or acquiescing in the breach.
>
> [*Id.* at 278, 175 *A.* 609.]

The Vice Chancellor observed that the "[d]raining of these accounts into ... private accounts, if noticed, may have aroused suspicion, but that would not have been enough to halt the bank in discharging its obligation to the depositor." *Id.* at 280, 175 *A.* 609. "Glaring as the scheme now shows up," the Vice Chancellor noted it was "without circumstances recognized by the authorities as warranting either bank in refusing payment." *Ibid.* In ruling, the Vice Chancellor took pains to reiterate that negligence is not a relevant consideration in this analysis.

> The standard of due care or negligence and the doctrine of constructive notice in respect of bank deposits of fiduciary funds finds no recognition in the Fiduciaries Act. It definitely declares bad faith to be the test of liability. That was the rule at common law, and the statute but embodies the common law rule, making uniform its application and realigning whatever deviations it may have fallen into.
>
> [*Id.* at 277, 175 *A.* 609.]

Although the decision was affirmed on appeal, the Court of Errors and Appeals expressly declined to consider the soundness of the Vice Chancellor's view that

> although the depositor's conduct or course of dealing "may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust, such circumstances do not impose upon the bank the duty or give it the right to

institute any inquiry into the conduct of its customer, in order to protect those for whom the customer may hold the fund, . . . ."

[*New Amsterdam, supra*, 117 *N.J. Eq.* at 271, 175 *A.* 609 (quoting *Perry on Trusts* (7th ed.1924)).]

Thus, exactly what would trigger the duty to inquire further or risk being charged with notice of the fiduciary's misdeeds, remained an open question after *New Amsterdam*. This much is clear however: the dishonesty standard began to take on a life of its own.

The court in *Kaufman v. Trust Co.*, 130 *N.J. Eq.* 346, 348, 22 *A.*2d 279 (E. & A.1941), for example, reversed a determination that the Trust Company was on notice of misappropriation of estate funds by an executor who drew fifteen checks, totaling $36,000, and deposited them in his personal account to pay personal debts to the Trust Company. The Court of Errors and Appeals, citing *New Amsterdam*, held that "it was incumbent upon the complainant below to establish that the Trust Company knowingly participated in the embezzlement or had knowledge of such facts that its honoring of the checks drawn by the executor amount[ed] to bad faith." *Id.* at 349, 22 *A.*2d 279. The Court found "no inference of [the executor's] dishonesty" based on the personal debt owed to the Trust Company and the executor's inability to keep up with his payments. *Ibid.*

Similarly, in *Goldstein v. Commonwealth Trust Co.*, 19 *N.J.Super.* 39, 44, 87 *A.*2d 555 (Law Div.1952), when a check drawn on an attorney's special account was improperly honored, the court held that a bank owes "no duty to the trust estate save to refrain from participating in misappropriating the funds." Referring to *New Amsterdam*, the court noted that its holding applied even when a bank has adequate notice that an account is held by a depositor only in a fiduciary capacity. *Ibid.*

In *Murner v. First Nat'l Bank*, 94 *N.J.Super.* 293, 295, 228 *A.*2d 88 (App.Div.1967), a substituted trustee was unable to recover money misappropriated from a trust account by the original trustee. The complaint alleged that checks totaling over $6,000 payable to the trust estate were cashed over the counter, while checks over $1,000 were credited to the original trustee's personal

account. Because actual knowledge was not alleged, the controversy centered on whether the bank had knowledge of such facts that its action in taking the instruments in question amounted to bad faith:

> All that plaintiff had raised was at best a suspicion; to permit the case to go to the jury would merely invite speculation on its part. Although mindful of the fact that a motion for summary judgment should be granted with caution, especially where a matter such as bad faith is involved, ... there [is] nothing in the case from which a jury could legitimately conclude that there was bad faith on the part of any of the banks.

> [*Id.* at 297, 228 *A.*2d 88.]

The Appellate Division affirmed the judgment of the trial court, citing the UFA and *New Amsterdam* as "entirely persuasive and determinative of this case." *Id.* at 298, 228 *A.*2d 88. Although *New Amsterdam* and its progeny gave lip service to the statutory bad faith standard, they made it almost impossible to establish bank liability in the absence of actual knowledge of fiduciary embezzlement.

*Lustrelon, Inc. v. Prutscher,* 178 *N.J.Super.* 128, 131, 428 *A.*2d 518 (App.Div.1981) offers a more measured approach. There a foreign bank appealed from a grant of summary judgment to a bank that issued a letter of credit. The foreign bank had honored the letter of credit when the beneficiary presented a signed draft and document, purportedly in compliance with the letter. It then sought reimbursement from the issuing bank. The Appellate Division reversed the judgment in favor of the issuing bank and remanded the case for a subjective good faith determination regarding the issuance of the letter of credit. *Id.* at 144, 428 *A.*2d 518. Citing the *New Amsterdam* definition of bad faith, the court described that term as including some "indicia of dishonest conduct *or* a showing of facts and circumstances '... so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction.'" *Ibid.* (quoting *Edwards v. Northwestern Bank,* 39 *N.C.App.* 261, 250 *S.E.*2d 651, 655–656 (1979)).

The majority of out-of-state cases that have interpreted the bad faith standard in the fiduciary context have referred to dishonesty as a guiding principle. *E.g. Macon v. Edgcomb,* 274 *Ill.App.*3d 432, 211 *Ill.Dec.* 136, 654 *N.E.*2d 598 (1995); *Trenton Trust Co. v. Western Sur. Co.,* 599 *S.W.*2d 481 (Mo.1980); *Guild v. First Nat. Bank,* 92 *Nev.* 478, 553 *P.*2d 955 (1976); *Manfredi v. Dauphin Deposit Bank,* 697 *A.*2d 1025 (Pa.Super.1997); *Research–Planning, Inc. v. Bank of Utah,* 690 *P.*2d 1130 (Utah 1984). However, those cases have not infused the term with a high degree of corruption or evil motive. Indeed, most characterize "dishonesty" as a way of distinguishing bad faith from mere negligence, and view it as evidencing purposeful conduct. *See Guild, supra,* 553 *P.*2d at 958 (requiring showing the bank "actually knew or suspected that funds were being misappropriated, or deliberately or wilfully closed its eyes or refused to investigate after having its suspicions aroused.") In other words, although continuing to use the word "dishonesty" to explain bad faith, the cases characterize dishonesty as something other than a moral failing, for example, intentionally disregarding or refusing to learn the available facts (*Peoples Nat'l Bank v. Guier,* 284 *Ky.* 702, 145 *S.W.*2d 1042, 1047 (1940)); deliberately refraining from investigating facts that suggest fiduciary is acting improperly (*Macon, supra,* 211 *Ill.Dec.* 136, 654 *N.E.*2d at 601); and intentional closing of "the eyes or stopping of the ears" (*Research–Planning, supra,* 690 *P.*2d at 1132).

Nearly all of those cases take their cue from *Maryland Cas. Co. v. Bank of Charlotte,* 340 *F.*2d 550 (4th Cir.1965). There a corporate secretary converted to her own personal use nineteen corporate checks totaling over $18,000. The checks were either cashed, credited to her personal account, or applied towards loans she had at the bank. *Bank of Charlotte, supra,* 340 *F.*2d at 551–52. In interpreting the UFA, the Court of Appeals relied on the Uniform Negotiable Instruments Act, *Cahill's Rev. St.* c. 98 (1929), to define bad faith because the language of the UFA was borrowed from that statute. *Ibid.*

The court concluded that "[t]he Bank's personnel had before their eyes clear evidence of a probable misappropriation." *Id.* at 554. "Giving the Bank the benefit of the most favorable construction of the statute," the court held the Bank was not liable for cashing the first check, but was liable for the second check, which should have triggered knowledge, and for all subsequent checks. *Id.* at 555. It stated:

> The Bank again protests, this time, that it could not have acted in 'bad faith' since it did not act dishonestly. It is true that courts construing the U.F.A. have sometimes read 'bad faith' to mean 'dishonesty.' *See, e.g., Western Surety Co. v. Farmers & Merchants State Bank,* 241 *Minn.* 381, 63 *N.W.*2d 377 (1954); *National Casualty Co. v. Caswell and Co.,* 317 *Ill.App.* 66, 45 *N.E.*2d 698 (1942). This abbreviated definition is inaccurate if it is read to emphasize and require a high degree of moral guilt. Neither criminal fraud nor downright corruption is an essential ingredient of legal bad faith.' The 'bad faith' test was borrowed from the Uniform Negotiable Instruments Act. *Paine v. Sheridan Trust & Savings Bank,* 342 *Ill.* 342, 174 *N.E.* 368 (1931). The standard used in construing the term under that Act has not been evil motive. Instead courts have asked whether it was commercially unjustifiable for the payee to disregard and refuse to learn facts readily available. *Taylor v. Citizens Bank* 290 *Ky.* 149, 160 *S.W.*2d 639 (1942). At some point, obvious circumstances become so cogent that it is bad faith' to remain passive.

> [*Id.* at 554.]

Under *Bank of Charlotte,* where circumstances suggestive of a fiduciary's breach become sufficiently obvious, a duty to act is created. In fact, the Appellate Division has already used this standard in *Lustrelon, supra,* 178 *N.J.Super.* at 144–45, 428 *A.*2d 518. *See also Appley v. West,* 832 *F.*2d 1021, 1031 (7th Cir.1987) (quoting *Bank of Charlotte, supra,* 340 *F.*2d at 554, for the proposition that at "some point, obvious circumstances become so cogent that it is 'bad faith' to remain passive").

In our view, a hybrid formulation drawn from *New Amsterdam, Bank of Charlotte* and its progeny most closely approximates the meaning of bad faith under the UFL. We hold that bad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary. It is not established by negligent or careless conduct or by vague suspicion. Likewise, actual knowledge of and complicity in the fiduciary's misdeeds is not required. However, where facts sug-

gesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge. The so-called dishonesty standard, which has been a static epithet in our bad faith jurisprudence, should not be interpreted as having sinister implications but only as a way of differentiating bad faith from negligence in terms of purpose. *See Pickett v. Lloyd's*, 131 *N.J.* 457, 473, 475, 621 A.2d 445 (1993) (confirming that bad faith is borne of reckless indifference to apparent facts).

■ Because of the nature of this standard, each case will necessarily be fact sensitive. Whether, in light of the foregoing, the Bank acted in bad faith in continuing to honor Caputo's trust account checks is not a matter we decide, nor should the trial court have done so on the motion for summary judgment. The test for good or bad faith is a subjective one to be determined by the trier of fact unless only one inference from the evidence is possible. *Lustrelon, supra,* 178 *N.J.Super.* at 144–45, 428 A.2d 518 (citing *Community Bank v. Ell,* 278 *Or.* 417, 564 P.2d 685 (1977)). That is not the case here.

■ Without belaboring the point, it is for a jury to determine whether the Bank recklessly disregarded or was purposefully oblivious to facts suggesting impropriety by Caputo. Included among the jury's considerations will be the facts surrounding the almost daily withdrawals to himself from Caputo's trust account, amounting to $291,000, each of which was approved by Kane or Martin; the fact that Kane and Martin understood these withdrawals to be extraordinary; their concomitant knowledge of Caputo's regular dealings at a gambling casino; their willingness to close Caputo's business account, which held low or negative balances, while allowing the trust account, which held substantial client funds, to remain open; the fact that the Bank allowed Caputo to withdraw over $25,000 from his trust account the day after the business account was closed and the Bank's failure to report Caputo to the I.R.S. contrary to its established policies.

We do not suggest that every instance of an improper withdrawal will trigger a finding of bad faith or a duty to investigate on the part of a bank.   Without more, it seems unlikely that a single transaction or even a few isolated transactions would be sufficient to defeat a bank's motion for summary judgment.   However, a reasonable jury could hold the Bank accountable from the time it closed Caputo's business account, or earlier, based on the facts developed at trial.   Our holding today is based on the cumulative facts contained in the record.   Future cases will be similarly decided on their particular facts in keeping with the standard announced here.

## IV

The judgment of the Appellate Division is reversed.   The matter is remanded to the Law Division for a trial to determine whether the Bank acted in bad faith in failing to inquire further about Caputo's withdrawals from his trust account.

In light of this opinion, and because banks may be unsure of exactly what steps to take when presented with cogent and obvious evidence of fiduciary impropriety, we refer this matter to the Professional Responsibility Rules Committee (PRRC).   The PRRC is to consider *Rule* 1:21–6, which enables us to monitor loose practices in trust accounting, in light of the principles to which we have adverted, and recommend changes in the reporting requirements of section (a)(2) of the rule.   In its deliberations, the PRRC should specifically address the issues of direct and electronic withdrawals from an attorney's trust account and any other practices it deems indicative of problematic fiduciary behavior.   Technology may enable us to adopt preventive measures that would, without burdening the banking industry, better protect our citizens and the title insurance industry.   We leave it to the PRRC to explore those possibilities.   The PRRC should consult with and obtain the views of the banking and title insurance industries and of the relevant government regulators in formulating its recommendations.   If it chooses to do so, the PRRC may appoint a

158

subcommittee that includes representatives of those constituencies.

*For reversal and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Opposed*—None.