ANN WALSH BRADLEY, J. (concurring).
¶76 I agree with the lead opinion[1] that summary judgment *303 was properly granted to Park Bank. See lead op., ¶71. I write separately, however, because in interpreting a uniform law, the lead opinion unearths *40 a heretofore unknown standard for bad faith. *304 ¶77 The lead opinion errs in its creative exercise in two ways. First, this new standard for bad faith runs afoul of the legislative directive that uniform laws are to be interpreted uniformly with other jurisdictions. Second, the legal standard for bad faith that the lead opinion embraces is too exacting on bank customers with Uniform Fiduciaries Act (UFA) claims.
¶78 Because I determine that Wisconsin should adopt a bad faith standard that promotes uniformity among the states, vindicates the purpose of the UFA, and provides bank patrons with a meaningful check on bank behavior, I respectfully concur.
I
¶79 The Uniform Law Commission, which has a diverse representation from all fifty states, promulgates uniform laws for consideration by state legislatures.
*305 "The purpose of uniform laws is to establish both uniformity of statutory law and uniformity of case law construing the statutes, ensuring certainty and guidance to litigants who rely on the courts to interpret uniform statutes in a predictable and consistent manner." Estate of Matteson v. Matteson, 2008 WI 48, ¶42, 309 Wis. 2d 311, 749 N.W.2d 557 (citing M.J. Wallrich Land & Lumber Co. v. Ebenreiter, 216 Wis. 140, 143, 256 N.W. 773 (1934) ). In this context, the goal is to provide uniformity and predictability for both banks and those who use them, regardless of the state in which the banking transaction occurs.
¶80 At issue here is the bad faith provision set forth in Wisconsin's enactment of the UFA. Wis. Stat. § 112.01(9). It is substantially identical to other state enactments throughout the country.[2] Pursuant to this provision, a bank that wrongfully cashes a check can be liable to a defrauded principal if one of two possibilities is fulfilled: (1) the bank has actual knowledge that the fiduciary is committing a breach of his or her obligations or (2) the bank acts in "bad faith." § 112.01(9).[3] The question before us is the standard that must be fulfilled for a plaintiff to prove "bad faith" in this context.
*306 ¶81 The lead opinion observes that "bad faith" is inconsistent with "good faith," a defined term in the statute. Lead op., ¶3; see Wis. Stat. § 112.01(1)(c). Using the definition of "good faith" as a springboard, it concludes that "bad faith pursuant to § 112.01(9), which is an intentional tort, may be shown by acts evidencing bank dishonesty such as a bank willfully failing to further investigate compelling and obvious known facts suggesting fiduciary misconduct because of a deliberate desire to evade knowledge of fiduciary misconduct." Lead op., ¶3.
¶82 Wisconsin Stat. § 112.01 does not define "bad faith." However it does provide some guidance to our endeavor, dictating that our state's UFA "shall be so interpreted and construed as to effectuate *41 its general purpose to make uniform the law of those states which enact it." § 112.01(14). Thus, we look to the case law of other states to guide our analysis.
¶83 The lead opinion correctly observes that other jurisdictions have been inconsistent in defining bad faith when it states, "variations in facts from which claims of bad faith arose have resulted in different expressions of the definition of bad faith, with bank dishonesty expressed in most decisions." Lead op., ¶31 (citations omitted). However, it errs when it deviates from the legislative directive that the interpretation of our uniform laws be consistent with the interpretations adopted by our sister states.
¶84 Contrary to the directive, the lead opinion adopts a standard for bad faith that is inconsistent with the majority of our sister states that have interpreted the uniform act. It is not even consistent with a minority of states' interpretations. The standard for *307 bad faith that the lead opinion embraces does not closely track the case law in any other jurisdictions. Wisconsin stands alone.
II
¶85 Although there has been some inconsistency in interpretation among the various states, not all expressions of the definition of bad faith are created equal. The standard this court adopts should promote uniformity and vindicate the purpose of the UFA, while at the same time avoid placing an inordinate and nearly impossible burden on bank patrons.
¶86 Several courts have adopted such a standard. They interpret the UFA bad faith standard to attach liability to a bank in the event the bank does not affirmatively act but simply "remains passive" in the face of compelling and obvious facts suggesting fiduciary misconduct. See In re Broadview Lumber Co., 118 F.3d 1246, 1251 (8th Cir.1997) ; Maryland Cas. Co. v. Bank of Charlotte, 340 F.2d 550, 554 (4th Cir.1965) ; Time Savers, Inc. v. LaSalle Bank, N.A., 371 Ill.App.3d 759, 309 Ill.Dec. 259, 863 N.E.2d 1156, 1165 (2007) ; New Jersey Title Ins. Co. v. Caputo, 163 N.J. 143, 748 A.2d 507, 514 (2000). As the New Jersey supreme court stated the standard in Caputo:
[B]ad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary. It is not established by negligent or careless conduct or by vague suspicion. Likewise, actual knowledge of and complicity in the fiduciary's misdeeds is not required. However, where facts suggesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge.
Caputo, 748 A.2d at 514.
*308 ¶87 I would adopt the Caputo standard in Wisconsin. This standard is preferable to that proffered by the lead opinion because it promotes uniformity and emphasizes that no "high degree of moral guilt" is required on the part of the bank. See Wis. Stat. § 112.01(14) ; Maryland Cas. Co., 340 F.2d at 554. "Neither criminal fraud nor downright corruption is an essential ingredient of legal 'bad faith.' " Maryland Cas. Co., 340 F.2d at 554. The Caputo standard would permit bank patrons with legitimate claims a better chance at relief. Otherwise, it is the rare customer indeed that will be able to demonstrate "willful" and "deliberate" actions on the part of a bank.
¶88 Importantly, such a standard also remains consistent with the purpose of the UFA. The UFA was instituted to provide banks with relief from the dire consequences of the previous common law rule *42 that entities dealing with fiduciaries had the duty to assure that fiduciary funds were properly applied to the account of the principal. Bolger v. Merrill Lynch Ready Assets Tr., 143 Wis. 2d 766, 774, 423 N.W.2d 173 (Ct. App. 1988) ; see Master Chem. Corp. v. Inkrott, 55 Ohio St.3d 23, 563 N.E.2d 26, 29 (1990) ("By altering the common law, the Act relaxes some of the harsher rules which require of a bank and of individuals the highest degree of vigilance in the detection of a fiduciary's wrongdoing.") (internal quotations and citations omitted). It was meant to "facilitate banking and financial transactions and place on the principal the burden of employing honest fiduciaries[,]" thereby relieving banks of their previously onerous duty. Bolger, 143 Wis. 2d at 775, 423 N.W.2d 173 (citing Johnson v. Citizens Nat'l Bank of Decatur, 30 Ill.App.3d 1066, 334 N.E.2d 295, 300 (1975) ).
¶89 Although the UFA was certainly enacted to provide relief to banks, it should not make proving a *309 bank's liability a mountain that is nearly impossible for a bank customer to scale. The Caputo standard strikes the right balance by furthering the purpose of the UFA while at the same time allowing bank patrons a more significant check on bank behavior.
III
¶90 I conclude that even under the less exacting Caputo standard, summary judgment for Park Bank is appropriate. Koss has not put forth evidence sufficient to create a genuine issue of material fact that Park Bank remained passive in the face of "compelling and obvious" facts suggesting fiduciary misconduct.
¶91 The sheer number of transactions and number of Park Bank employees involved in cashing Koss checks belie Koss's assertion that a nefarious pattern was apparent. Over the ten years of Sachdeva's embezzlement, a period during which Park Bank issued greater than 60,000 cashier's checks, forty-nine bank employees issued the 359 cashier's checks requested by Sachdeva. Lead op., ¶62, n.16. Neither "the amount and number of transactions carried out on an account containing fiduciary funds, nor the mere names of payees on checks drawn on that account, are sufficient to create bad faith liability based on the bank's action in paying such checks." Heffner v. Cahaba Bank & Tr. Co., 523 So. 2d 113, 115 (Ala. 1988).
¶92 Indeed, Koss itself did not notice the fraud for years. Even viewed in the light most favorable to Koss, the facts of this case do not present the "compelling and obvious" suggestion of fiduciary misconduct so as to foist liability onto Park Bank.
¶93 For the above stated reasons, I respectfully concur.
*310 ¶94 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON and Justice REBECCA FRANK DALLET join this concurrence.

Michael Koss

Koss Corporation's Vice-President of Finance was Sujata Sachdeva.

John C. Koss Jr.