DANIEL KELLY, J. (dissenting).
¶95 There is no bad faith, Park Bank says, when it disburses funds from fiduciary accounts while intentionally remaining ignorant of whether the individuals making the requests have authority to transact business on those accounts. The court agreed-not as a matter of fact, but of law. Because the law does not require that conclusion, I respectfully dissent.
*
¶96 Bad faith does not exist in a vacuum-it occurs in the context of a specific relationship. Here, Koss Corporation tells us the bad faith took place within a relationship created by statute as well as the documentation requested and maintained by Park Bank. With respect to the latter, Park Bank provided a copy of its Depository *43 Declaration form to Koss Corporation to complete and return. The form's purpose is to identify the Koss Corporation employees who have authority to transact business on the company's accounts:
The persons and the number thereof designated by name or title on the reverse side opposite the accounts ("authorized person") are authorized, for and on behalf of the Depositor, (a) to sign checks, drafts notes, bills, certificates of deposit and other orders for payment or withdrawal of money from the accounts and to issue instructions regarding them, (b) to endorse for cash, deposit, negotiation, collection or discount by the Bank any and all checks, drafts, notes, bills, certificates of *311 deposit or other instruments or orders for the payment of money owned or held by the Depositor.
Koss Corporation identified its President & CEO,[1] Vice-President of Finance,[2] Vice-President of Sales,[3] and Vice-President of MIS as the only "authorized persons" to transact business on its general account.
¶97 Koss Corporation subsequently submitted a Corporate Authorization Resolution to Park Bank, which (as with the Depository Declaration) identified the employees authorized to transact business on its accounts. It provided that "[a]ny agent listed below, subject to any written limitations, is authorized to exercise the powers granted as indicated below: ... (3) Endorse checks and orders for the payment of money or otherwise withdraw or transfer funds on deposit with this Financial Institution." The resolution identified only three people: Michael J. Koss, John C. Koss Jr., and Sujata Sachdeva. Together, the resolution and Depository Declaration serve as the "signature card," and so I will refer to them as such.
¶98 Park Bank had Koss Corporation's completed signature card on file before Ms. Sachdeva embarked on her embezzlement spree, and it remained on file all during her criminal behavior. So that is the documentary aspect of Koss's relationship with Park Bank.
¶99 The statutory aspect of the Park Bank/Koss Corporation relationship arises from Wis. Stat. § 112.01(9), a provision that received such intense, but narrow, inspection that its significance seems to have *312 become a little warped. The court's analysis, with a heavy assist from the parties, gives the impression that § 112.01(9) created a bank-specific tort of "bad faith." It didn't. Customers were free to bring bad faith actions against banks before adoption of § 112.01(9), and they can, right now, bring those claims without ever mentioning this statute. And that is true because § 112.01(9) does nothing but give banks limited immunity from liability for improper transactions on fiduciary accounts.
¶100 The statute starts with a grant of immunity, followed by two potentially relevant exceptions.[4] The immunity provision says: "If a check is drawn upon the account of a fiduciary's principal in a bank by a fiduciary, who is empowered to draw checks upon his or her principal's account, the bank is authorized to pay such check without being liable to the principal...." Wis. Stat. § 112.01(9). The relevant exception clauses say the immunity applies "unless the bank pays the check [1] with *44 actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing such check, or [2] with knowledge of such facts that its action in paying the check amounts to bad faith." Id.
¶101 The first exception to immunity depends on the nature of the fiduciary's actions. That is, the analysis focuses on the fiduciary's culpable conduct in relation to his company. If the fiduciary is "committing a breach of the fiduciary's obligation," and the bank knows it, there is no immunity from liability. Id. I'll refer to this exception as a "Fiduciary Breach Exception."
*313 The second exception, however, depends on the bank's conduct in relation to the company. If the bank's knowledge of relevant facts makes the transaction an act of bad faith, there is no immunity. That is to say, Wis. Stat. § 112.01(9) provides no defense against a common-law claim of bad faith. I'll refer to this exception as a "Bad Faith Exception."
¶102 The difference between the Fiduciary Breach Exception and the Bad Faith Exception is important because Koss Corporation's complaint described two conceptually distinct categories of transactions. The first comprises those in which Ms. Sachdeva personally contacted Park Bank to initiate the process. The second encompasses those initiated by Koss Corporation employees who were not listed on the signature card maintained by Park Bank. The court collapsed the two, and applied an analysis to the resulting mélange that was suitable for only one of the categories. In doing so, it missed Park Bank's potential bad faith with respect to many of the transactions described by Koss Corporation.
¶103 A proper assessment of Park Bank's potential liability requires us to test the two categories of suspect transactions against the two exceptions to the immunity provided by Wis. Stat. § 112.01(9). The four possible permutations are as follows:
1. Did the transactions initiated by Ms. Sachdeva create a Fiduciary Breach Exception to immunity (Combination 1)?
2. Did the transactions initiated by Ms. Sachdeva create a Bad Faith Exception to immunity (Combination 2)?
3. Did the transactions initiated by unauthorized Koss employees create a Fiduciary Breach Exception to immunity (Combination 3)?
*314 4. Did the transactions initiated by unauthorized Koss employees create a Bad Faith Exception to immunity (Combination 4)?
Because my purpose in this dissent is simply to demonstrate that Koss Corporation identified matters that should have gone to the jury for its consideration, I will not assess each of the combinations; addressing only the fourth should be sufficient to make the point.
*
¶104 With respect to Combination 4, the task is to determine whether Park Bank acted in bad faith when it processed a transaction on a fiduciary account without first checking the fiduciary's name against the signature card. And so we arrive at the heart of the lead opinion, to wit, the definition of "bad faith." It said that, for purposes of Wis. Stat. § 112.01(9), "bad faith" means "acts evidencing bank dishonesty such as a bank willfully failing to further investigate compelling and obvious known facts suggesting fiduciary misconduct because of a deliberate desire to evade knowledge of fiduciary misconduct." Lead op., ¶¶3, 73. I disagree with this formulation because it improperly mixes elements of the Fiduciary Breach Exception with elements of the Bad Faith Exception.
*45 ¶105 As I mentioned above, the Fiduciary Breach Exception inquires into the fiduciary's fidelity to his company. The Bad Faith Exception does not. With respect to this exception, the terms of Wis. Stat. § 112.01(9) require only that the bank know of facts sufficient to demonstrate it-the bank-had acted in bad faith in conducting the transaction. And although bad faith may arise out of knowledge of a fiduciary's misconduct, the statute's terms do not limit the tort to *315 such a situation. Nor does the statute's context or structure suggest such a reading is necessary, or even reasonable. So when the court borrowed "fiduciary misconduct" from the Fiduciary Breach Exception and imported it into the Bad Faith Exception, it gratuitously and atextually limited the type of facts that could establish a bank's bad faith.
¶106 I agree with Justice Ann Walsh Bradley that we should adopt a definition of "bad faith" that comports with our sister states. However, I would not adopt (as she does) the Caputo standard because it, too, conflates the Fiduciary Breach Exception with the Bad Faith Exception. The New Jersey Supreme Court said:
[B]ad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary. It is not established by negligent or careless conduct or by vague suspicion. Likewise, actual knowledge of and complicity in the fiduciary's misdeeds is not required. However, where facts suggesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge.
N.J. Title Ins. Co. v. Caputo, 163 N.J. 143, 155-56, 748 A.2d 507, 514 (2000). The references to the fiduciary's "impropriety," "misdeeds," or "misconduct" (if we adopted this test) would read into the Bad Faith Exception limiting factors that simply do not exist in the statute's language.
¶107 I think the United States Court of Appeals for the Fourth Circuit more accurately assesses bad faith in this context:
*316 Neither criminal fraud nor downright corruption is an essential ingredient of legal 'bad faith.' The 'bad faith' test was borrowed from the Uniform Negotiable Instruments Act. The standard used in construing the term under that Act has not been evil motive. Instead courts have asked whether it was 'commercially' unjustifiable for the payee to disregard and refuse to learn facts readily available. At some point, obvious circumstances become so cogent that it is 'bad faith' to remain passive.
Maryland Cas. Co. v. Bank of Charlotte, 340 F.2d 550, 554 (4th Cir.1965) (citations and footnote omitted). This standard is compatible with the language of Wis. Stat. § 112.01(9) because it does not limit the tort to instances of fiduciary misconduct. Instead, it accurately reflects the statutory structure in that it allows a plaintiff to address the bank's bad faith independently from that of the fiduciary.
*
¶108 Applying those principles to this case inevitably leads to the conclusion that the circuit court should have allowed Koss Corporation to submit the Combination 4 transactions to the jury. Everyone acknowledges that Park Bank allowed Koss Corporation employees who were not listed on the signature card to request and pick up cashier's checks. See lead op., ¶63.[5]
*46 They also agree that Park Bank allowed one such employee to draft a counter check against Koss Corporation's account, cash it, and use the proceeds to *317 purchase two cashier checks. Id., ¶64. The facts of record demonstrate that a jury could find Park Bank acted in bad faith when it remained intentionally ignorant of whether the individuals transacting business on Koss Corporation's accounts had the authority to do so.
¶109 In summarily dismissing the significance of this conduct, the court illustrated the defect in its analytical structure. It said that "Koss Corporation does not explain how Mulvaney's being a non-signatory amounted to an obvious and compelling fact that Sachdeva was breaching her fiduciary obligations to Koss Corporation." Id., ¶63. That misses the point. If we were analyzing this case under the Fiduciary Breach Exception to immunity, we would be interested in Ms. Sachdeva's conduct toward Koss Corporation. But we aren't doing that analysis, and so we aren't particularly interested in Ms. Sachdeva's behavior. We are instead assessing Koss Corporation's claims under the Bad Faith Exception to immunity, which means the proper focus is on Park Bank's conduct toward Koss Corporation.
¶110 Properly re-oriented, the undisputed facts reveal a pattern of conduct that should cause any corporate officer's heart to fearfully skip a beat, or several. Park Bank said, unapologetically(!), that its policy is to remain intentionally and steadfastly ignorant of whether an individual has the authority to transact business on a fiduciary account. Avoiding that knowledge takes some effort because the information resides in the bank's own records. It's in the signature card, the specific purpose of which is to tell the bank *318 which of Koss Corporation's employees may access the company's accounts. Yet the bank deliberately and consistently refused to consult the signature card to determine whether it was helping an unauthorized person gain access to a fiduciary account.
¶111 This is not evidence of negligence, as the court would have it. Id., ¶57. Negligence would be a bank employee forgetting to check the signature card, or checking so cursorily that the names failed to register in his mind, or a training regimen that failed to teach employees to check the signature cards, or an inconstant enforcement of a policy to check the signature cards. None of that is at issue here. What Park Bank did was intentional. It chose to ignore its depositors' signature cards. It chose not to know whether the Koss Corporation employees with whom it was dealing had the authority to access the company's accounts. It chose to have a policy of ignorance with respect to its customers' instructions. The consequence of those intentional choices was that it disbursed enormous sums of money to people who were not authorized to access Koss Corporation's accounts.
¶112 This does not mean, however, that Park Bank is necessarily liable to Koss Corporation. It is possible that a jury would find no bad faith in Park Bank's conduct. Further, Koss Corporation must still prove that Park Bank's actions were the proximate cause of its damages. If Park Bank had called Koss Corporation when an unauthorized employee tried to access its accounts, perhaps Ms. Sachdeva's embezzlement attempt would have been revealed. We know this is possible, because her scheme came to light when American Express observed suspicious activity on Koss Corporation's account and *47 called to investigate. Or perhaps Park Bank's call would have gone to Ms. *319 Sachdeva, who would have been in a position to ratify what the unauthorized employee was doing.
¶113 These "perhaps" are within the jury's province, and a jury should have been allowed to consider them. Caputo, 748 A.2d at 514 ("The test for good or bad faith is a subjective one to be determined by the trier of fact unless only one inference from the evidence is possible."). By concluding, as a matter of law, that Park Bank's intentional ignorance of its own records could not amount to bad faith, we erred.
¶114 For the foregoing reasons, I respectfully dissent.
¶115 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this dissent.

I use the term "lead" opinion because I am concerned that without this cue, the reader may mistakenly believe that the lead opinion has precedential authority. Although five justices join in the mandate of the opinion to affirm the court of appeals, it represents the reasoning of only two justices (Roggensack, C.J., joined by Ziegler, J.). I, along with Justices Abrahamson and Dallet, join in the mandate, but would rely on contrary reasoning. Justice Kelly, joined by Justice Rebecca Grassl Bradley, does not join in the mandate of the court, and would adopt a legal standard for bad faith that is also contrary to the lead opinion's formulation. Thus, although set forth in two separate opinions (this concurrence and Justice Kelly's dissent), five justices would not adopt the legal standard for bad faith set forth by the lead opinion.
In order to alert the public, litigants and courts, I urge the court to adopt a procedure requiring the author of a lead opinion to include an admonition that it is a lead opinion. The rationale for such a procedure is simple: lest there be confusion that the first appearing opinion be regarded as the majority opinion.
Recently such confusion arose in news reports referring to this court's opinion in State v. Mitchell, 2018 WI 84, 383 Wis. 2d 192, 914 N.W.2d 151, cert. granted, 2019 WL 166881 (U.S. Jan. 11, 2019) (No. 18-6210), announcing that the United States Supreme Court granted certiorari in that case. The first appearing opinion gave no alert that it was anything other than a majority opinion. Some media reports apparently assumed that the first appearing opinion garnered sufficient votes and referred to it as a majority opinion. See Kevin Lessmiller and Barbara Leonard, Unconscious Driver DUI Case Taken Up by Supreme Court, Courthouse News Service (Jan. 11, 2019), https://www.courthousenews.com/justices-take-up-unconsciousdrivers-dui-case/. Litigants and courts may inadvertently make the same erroneous assumption.
The only reference to "lead opinions" in our Internal Operating Procedures (IOPs) states that if during the process of circulating and revising opinions, "the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the 'lead opinion.' " Wis. S. Ct. IOP III(G)(4) (Feb. 22, 2018). The potential confusion that arises from mislabeling a lead opinion is exacerbated because the precedential effect (or lack thereof) of a lead opinion is uncertain. This remains an uncertainty even though two prior certifications from the court of appeals have asked us to resolve the issue. State v. Dowe, 120 Wis. 2d 192, 192-93, 352 N.W.2d 660 (1984) ; State v. Hawley, No. 2015AP1113-CR, unpublished certification, 2-3 (Nov. 21, 2018); see also State v. Lynch, 2016 WI 66, ¶145, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson and Ann Walsh Bradley, JJ., concurring in part, dissenting in part).
In the midst of the potential confusion and uncertainty, the very least we can do is to alert the reader to beware that no part of the rationale in the first appearing opinion has garnered a majority vote. Unlike the first appearing opinion in Mitchell, 383 Wis. 2d 192, 914 N.W.2d 151, which completely failed to advise, the lead opinion here takes a first step. It announces that only two justices join the opinion in totality. But that leaves unanswered the question of whether any of the separate writings join in part.
When the opinion originally circulated as the majority fails to garner sufficient votes during the process of revising and circulating opinions, it should as clearly as possible advise the reader of its status. It is not something that should be hidden or left for the reader to figure out.

See, e.g., Ariz. Rev. Stat. Ann. § 14-7507 ; 760 Ill. Comp. Stat. 65/8 ; Ind. Code § 30-2-4-8 ; Md. Code Ann., Est. & Trusts § 15-207 ; Minn. Stat. § 520.08 ; N.J. Stat. Ann. § 3B:14-55 ; N.C. Gen. Stat. § 32-9 ; Ohio Rev. Code Ann. § 5815.07 ; 7 Pa. Cons. Stat. § 6392.

Wis. Stat. § 112.01(9) provides:
If a check is drawn upon the account of a fiduciary's principal in a bank by a fiduciary, who is empowered to draw checks upon his or her principal's account, the bank is authorized to pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith.

The lead opinion lists all three potential exceptions to immunity. See lead op., ¶¶27-28. However, because the facts of this case do not implicate the third exception, I will confine my attention to the first two.

Although these employees were not listed as individuals authorized to transact business on Koss Corporation's accounts, they were, nonetheless, fiduciaries. According to Wis. Stat. § 112.01(1)(b), a "fiduciary" includes an "agent" of a corporation. It is fair to say that the Koss Corporation employees were holding themselves out as agents of the company when they transacted business on Koss Corporation's accounts.