**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1322-24

IN THE MATTER OF
GREGORY RINDOSH,
BURLINGTON COUNTY,
DEPARTMENT OF HUMAN
SERVICES.

_____

Submitted February 23, 2026 – Decided March 13, 2026

Before Judges Natali, Walcott-Henderson, and Bergman.

On appeal from the New Jersey Civil Service Commission, Docket No. 2023-0201.

Bedi Rindosh, attorneys for appellant Gregory Rindosh (Jason A. Rindosh, of counsel and on the briefs).

Malamut & Associates LLC, attorneys for respondent Burlington County, Department of Human Services (Margaret E. McHugh, on the brief).

Jennifer Davenport, Acting Attorney General, attorney for respondent New Jersey Civil Service Commission (Mark A. Gulbranson, Jr., Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Petitioner Gregory Rindosh appeals from a November 27, 2024 final administrative action of the Civil Service Commission (CSC) affirming the findings of fact and conclusions of law of the Administrative Law Judge's (ALJ) initial decision, removing him from employment as a fiscal analyst with the Burlington County Department of Human Services (County) during the working test period.

In this administrative appeal, we consider whether the CSC's decision to adopt the ALJ's findings and uphold petitioner's removal was arbitrary, capricious, or unreasonable, particularly given petitioner's more than twelve months of service in the subject position as a provisional employee. Relatedly, we also consider whether petitioner is entitled to reinstatement, back pay, and other benefits. Discerning no error by the CSC, we affirm.

I.

In November 2017, petitioner commenced employment as a grant accountant with Rowan College of Burlington County (RCBC) working pursuant to the federal Workforce Innovation and Opportunity Act (WIOA) grant. In this role, petitioner reported to Kelly West (Supervisor West), who oversaw the Workforce Development Board for the County.

2

In early fall 2020, the WIOA program was transferred from the RCBC to the County and in a letter dated October 15, 2020, the County offered petitioner a "position with the County . . . in the Human Services Department as a full time [f]iscal [a]nalyst, at a salary of $50,000.00." This offer letter informed petitioner that his employment would be:

> "[C]onsidered provisional based upon appointment from a Civil Service list and completion of a [ninety] day (probationary) working test period." (emphasis in original). It is [petitioner's] "responsibility to watch for the announcement on the NJ Civil Service website. When announced, [he] will be required to file an application for the examination prior to the deadline date. For a permanent appointment, [he] must place within the first [three] interested individuals on the certification list, provided there are no interested veterans or disabled veterans."
>
> (Emphasis in original).

The offer letter further advised petitioner that his "union status will be represented" by the Communications Workers of America (CWA) Local 1036 and provided instructions on how he could contact the union if he was interested in enrolling as a member. Within weeks, union representative Billie Scelza contacted petitioner to inquire into whether he would be interested in joining the union.

3

Petitioner accepted the County's offer and worked as a provisional employee starting on November 2, 2020. Following his transfer to the County, petitioner's job duties, office location, and supervisor remained unchanged. Petitioner also became active with the union, attending collective bargaining sessions, participating in the union negotiation committee, and engaging in other union-related activities during working hours. According to petitioner, Supervisor West, County Management, and the Director of Human Resources Richard Lombardo were repeatedly notified about the nature and scope of his involvement with the union throughout his employment with the County.

In January 2022, the CSC announced an examination for the fiscal analyst title. Supervisor West encouraged petitioner to apply for the fiscal analyst position, which he did. The CSC later issued a certification list of five eligible candidates, but only two candidates expressed interest in the position.

Through the interview process, the CSC used a "qualifying unassembled examination" mode based on education and experience to score the applicants, and according to the record, all eligible candidates received identical test scores. Petitioner appealed the scoring decision to the CSC, arguing that his score failed to reflect his experience and qualifications, given that he had performed the duties of the position for more than three years, including the time before the

4

position was transferred to the County. In denying his appeal, a CSC human resource consultant explained that only one candidate—a disabled veteran—ranked first on the eligible list, while the other three candidates, including petitioner, all ranked second, and there was no basis to disturb his score and rank on the subject eligible list. By that time, petitioner had been serving in the position of fiscal analyst with the County for more than one year following his November 2020 appointment.

Petitioner was subsequently offered permanent appointment to the fiscal analyst position and the County notified petitioner that his working test period would relate exclusively to his new appointment and not any prior provisional service. Petitioner's ninety-day working test period commenced as of April 1, 2022. Petitioner was evaluated by Supervisor West three times during his test period: at the thirty, sixty, and ninety-day mark. During this time, he also became a more active participant in union activities, including joining the CWA contract negotiation committee, attending negotiation meetings, and organizing a town hall forum to discuss work-related issues.

In his first evaluation at the thirty-day mark, petitioner's work product and communication skills were noted as having "met expectations," but his "Attendance/Punctuality" was noted as being "Below Standard." Petitioner's

A-1322-24

second evaluation at the sixty-day mark, noted improvement in punctuality, an "Outstanding" mark for attendance, and "Above Standard" for compliance with policies and procedures. Time management, however, was noted as requiring improvements. The record also shows that around this time, Supervisor West exchanged several emails with petitioner complaining about the poor quality of his work and citing deficiencies in time management and delays in processing invoices. Petitioner's third and final evaluation at the ninety-day mark was markedly negative. In fact, apart from "Attendance/Punctuality," all other categories were marked "Below Standard" for the first time and included a comment noting that his compliance and communication "with [S]upervisor [West], coworkers and vendors is at best poor at times."

The County subsequently scheduled a meeting to discuss the evaluation with petitioner; however, he called out sick the same day and was thereafter on a pre-approved vacation. With the probationary period set to expire on July 1, 2022, the County attempted to serve petitioner with a termination letter and notice of appeal rights via email and later at his home address.[1] The record includes a "hand-delivered" July 1, 2022 letter to petitioner, in which the County

---

[1] According to the County, they attempted to serve petitioner electronically by email to both his work and personal accounts, as well as by mail, via the sheriff's office.

A-1322-24

wrote that petitioner would be terminated due to "poor job performance" by the end of his working test period—June 30, 2022—and that he had "the right to appeal this termination within [twenty] days to the [CSC]." Petitioner would later assert that he was not personally served until July 8, 2022, when he met with Director Lombardo in the presence of Scelza and received his evaluation and termination notice.

On July 19, 2022, petitioner filed a timely appeal before the CSC and the matter was transferred to the Office of Administrative Law (OAL) for a hearing as a contested case in accordance with the Administrative Procedure Act, N.J.S.A. 52:14B-1. The OAL held a plenary hearing on three non-consecutive days—October 25, October 26, and December 22, 2023, in which, petitioner, Scelza, Supervisor West, and Director Lombardo all testified.

Scelza testified that he approached petitioner to participate in the union contract negotiations

> [b]ecause he was a newer employee. He's . . . younger, had some good ideas. . . . [and Scezla] thought that . . . he would be a good fit for the contract negotiations plus we had no one from human services on the contract negotiations for at least three contracts, maybe longer.

When asked about petitioner's provisional employment status, Scelza explained that "there w[ere] a lot of people that were in a provisional status

7

because the delay from civil service of announcements because of COVID [-19]." In response to the question whether the County was required to make a provisional employee permanent after a certain amount of time, Scelza responded "no."

In his testimony, petitioner did not dispute any of the facts regarding his hiring by RCBC, the County or his duties both as a provisional employee and later during the ninety-day test period. He testified that he performed his duties and using one example where Supervisor West had asked him to prepare "the cap and allocations set up, and by thirty days," he explained he found this assignment

> a little bit unreasonable considering it was a persistent problem and had been prior to my time for over four years namely . . . because there w[ere] critical questions that had to be answered and it would change the structure of how we could obligate and save grant funds.

Petitioner explained his responsibilities within the union, and how he informed other employees about their legal rights and permanent status. Petitioner further testified that after he joined the contract negotiation committee and increased his union involvement, "[Supervisor West] nitpicked me on anything and everything she possibly could have and it was apparent . . . that she leaned in even more as time progressed."

A-1322-24

Regarding permanency in the fiscal analyst title, petitioner testified that he believed he would attain permanent status within one year and stated that "[he] didn't know exactly, but [he] actually kind of thought [he] was already a permanent employee based on the time [he] had served." However, petitioner acknowledged on cross-examination that the 2020 October offer letter from the County specifically addressed his provisional appointment. In response to counsel's question whether there is anything in the letter supporting his position, petitioner's response was, "I don't believe so, not by this letter. . . . I don't know, I think it depends, I don't know."

Supervisor West testified that her post-appointment evaluations of petitioner were performed as if he were new to the organization and she did not consider his prior years in the subject position as a provisional employee. Regarding petitioner's ninety-day evaluation, Supervisor West testified it was below standard because he was not working to improve the deficiencies noted in the thirty or sixty-day evaluations. She explained that "there were numerous findings that had to be done by July 1 of the new program year and nothing was done," including an audit and invoices for computers that were left unpaid and that vendors were contacting her regarding payment. She further testified that following the thirty-day review, when she gave it to petitioner, "he laughed

9

hysterically and was very upset with the review," and demanded to be scored as "Outstanding." Similarly, when she gave him the sixty-day review, petitioner got very upset and threw it at her, and she recalled that he was very rude. Supervisor West further acknowledged that the decision to remove petitioner from employment was made directly before the ninety-day evaluation by herself, County management, and human resources.

Following the conclusion of the hearing, the ALJ issued a written decision on October 18, 2024, finding that much of petitioner's work with the County was similar to his work with RCBC, that petitioner was active in union activities, and was permitted time off during working hours to engage in those functions.

The ALJ further found that between the sixty-day and ninety-day review, there were a series of emails starting June 8, 2022, demonstrating that the supervisor-employee relationship became acrimonious, referring specifically to the following June 15 email from Supervisor West stating:

> I will not be providing day-to-day correspondence to you in writing. However, we spoke about your lack of time management skills in your last review period you need to be able to manage your time better period especially since we are not very busy due to the job center customer flow being very slow.
>
> You need to be better able to answer questions from the vendors and make the fiscal decisions in accordance to financial guidelines issued by the state and federal

10

governments. I do not make arbitrary decisions, I abide by those guidelines. If you would like to discuss further, please do not e-mail, communicate in person.

The ALJ next reviewed the applicable statutory framework governing public employee rights under N.J.S.A. 11A:1-1, as well as the provisions addressing provisional appointments under N.J.S.A. 11A:4-13(b), which state that "[i]n no case shall any provisional appointment exceed a period of 12 months."

Relying on our Supreme Court's opinion in O'Malley v. Dept. of Energy, 109 N.J. 309, 316-17 (1987), the ALJ concluded that petitioner's argument is misplaced since a provisional appointment that exceeds twelve-months does not create an automatic conversion from provisional to permanent appointment. Additionally, relying on the express language of the County's offer letter, the ALJ further concluded that "there is an absolute dearth of facts adduced that [petitioner] reasonably believed that he was in a permanent position or that he was not subject to the working test period." The ALJ also emphasized that petitioner's provisional employment occurred during the COVID-19 pandemic, observing that it was commonly understood at the time that timelines were frequently extended as a result of the pandemic.

The ALJ next addressed petitioner's argument that the County acted in bad faith in terminating him based on anti-union animus and used his alleged poor performance as a pretext for his firing. The ALJ explained that the burden is on petitioner and that the facts are in equipoise: petitioner argues "he was a model employee, one who ensured absolute compliance, and who was provided with Herculean tasks, setting him up to fail," and according to Supervisor West, "he was a difficult employee, one who, by the end of his working test period, could not be trusted and could not complete the tasks assigned." In the ALJ's words, "the truth—and whatever additional facts which were not adduced—lies in-between."

The ALJ found that petitioner was free to engage in union activities, and that he failed to file any union grievances during his employment, stating "the absence of contemporaneous writings, notes, conversations, and the like, all lead to the inevitable conclusion that, if it existed at all, it did not rise to the level of bad faith." The ALJ concluded that because the facts are well balanced, petitioner did not meet his burden of proving bad faith by a preponderance of the evidence and denied petitioner's appeal.

The CSC substantively accepted and adopted the ALJ's findings of fact, conclusions, and recommendations. The CSC added that petitioner failed to

prove that the ALJ failed to analyze his contentions of anti-union animus, referring to the ALJ's reasoning in the initial decision and concluding petitioner "presented no persuasive evidence that leads the Commission to come to a different conclusion." The CSC noted that having conducted its de novo review, it found no persuasive evidence to demonstrate the ALJ's credibility determinations were arbitrary, capricious or unreasonable. Thus, the CSC affirmed the ALJ's findings of fact and legal determinations. This appeal followed.

II.

Petitioner appealed the CSC's final administrative action, arguing the following points:

POINT I

THE [ALJ] ERRED IN FAILING TO RECOGNIZE [HIS] ATTAINMENT OF PERMANENT EMPLOYEE STATUS THROUGH OPERATION OF LAW.

A. Appellant Has a Presumption of Permanent Employee Status Under N.J.A.C. 4A:2-4.1(c).

B. The County Wrongfully Deprived Appellant of Permanent Employee Status Through Its Abuse of the Provisional Appointment Process.

13                                                      A-1322-24

POINT II

THE [ALJ] FAILED TO PROPERLY ANALYZE THE EVIDENCE OF RETALIATORY ANTI-UNION ANIMUS IN APPELLANT'S TERMINATION.

POINT III

THE [ALJ] ERRED IN FAILING TO FIND THE PRETEXTUAL NATURE OF THE COUNTY'S JUSTIFICATIONS FOR APPELLANT'S TERMINATION.

POINT IV

THE ALJ ERRED BY CONCLUDING [PETITIONER] FAILED TO MEET HIS BURDEN WITHOUT WEIGHING CONTEXTUAL EVIDENCE FAVORING APPELLANT.

POINT V

THE [ALJ] ERRED IN FAILING TO CONSIDER APPROPRIATE REMEDIES, INCLUDING REINSTATEMENT, BACK PAY, AND ATTORNEY'S FEES IN FAVOR OF [PETITIONER].

"Judicial review of agency determinations is limited." Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Com'n, 234 N.J. 150, 157 (2018) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). The "final determination of an administrative agency . . . is entitled to substantial deference." In re Eastwick College LPN-to RN Bridge Program, 225 N.J. 533, 541 (2016); see also In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (finding a "strong

A-1322-24

presumption of reasonableness attaches to the actions of the administrative agencies").

A reviewing "court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). The party challenging the agency's action has the burden of proving the action was arbitrary, capricious, or unreasonable. Lavezzi v. State, 219 N.J. 163, 171 (2014). In determining whether the agency's decision is arbitrary, capricious, or unreasonable, we must examine:

> (1) whether the agency's decision offends the State or Federal Constitution;
>
> (2) whether the agency's action violates express or implied legislative policies;
>
> (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

15

[In re Taylor, 158 N.J. 644, 656 (1999) (quoting Brady v. Bd. of Rev., 152 N.J. 197, 210-11 (1997)).]

A.

Petitioner first argues the final agency decision of the CSC was arbitrary and capricious in adopting the ALJ's legal and factual findings without properly considering his lengthy provisional service as a fiscal analyst prior to the commencement of the working test period. He further asserts that the CSC improperly denied him permanent employment status and his termination was motivated by bad faith and retaliatory animus, entitling him to appropriate remedies.

Under the Civil Service Act, N.J.S.A. 11A:1-1 to -12.3, civil service appointments are based on the employee's merit and abilities. N.J.S.A. 11A:1-2; Commc'ns Workers of Am., AFL-CIO v. N.J. Dep't of Pers., 154 N.J. 121, 128 (1998). Permanent status in the career service is achieved only after appointment from a certified eligible list and successful completion of a working test period. See N.J.S.A. 11A:4-15. Provisional appointments, by contrast, are strictly temporary and do not confer any protections of permanent status. See N.J.S.A. 11A:4-13(b); O'Malley, 109 N.J. at 316-17. The CSA provides that "[i]n no case shall any provisional appointment exceed a period of 12 months." N.J.S.A. 11A:4-13(b). However, for competitive positions, "the working test

period shall not include any time served by an employee under provisional . . . employment." Azzara v. Twp. of Waterford, 392 N.J. Super. 322, 327-28 (App. Div. 2007) (citing N.J.S.A. 11A:4-1; N.J.A.C. 4A:4-5.2(a)).

Guided by the well-established legal principles enunciated above and given our limited standard of review, we reject petitioner's arguments and affirm substantially for the reasons stated in the ALJ's comprehensive initial decision. We add the following brief comments to amplify our opinion rejecting petitioner's claims that he believed he was hired as a permanent employee in 2020 or that he attained permanent status in the subject position after serving in that position for twelve months.

First, the record before us makes clear that petitioner was hired by the County in a provisional capacity, with explicit written notice that both a competitive examination and successful completion of a working test period were required to attain permanent status. The October 2020 offer letter expressly advised petitioner that his appointment was "provisional," required him to monitor the Civil Service website for the examination announcement, and explained that permanent status would be attained only after appointment from a certified list and successful completion of a ninety-day working test period.

A-1322-24

We also observe petitioner's testimony to be significant on this issue. When presented with the County's 2020 offer letter on cross-examination, petitioner acknowledged the County's offer letter specifically addressed provisional employment and there was nothing in the letter to support his claim that he was being appointed to a permanent position in 2020. We are satisfied that this admission constitutes persuasive evidence that petitioner understood that he had been offered only provisional employment and that he knew it was his responsibility to apply for the position once the CSC announced the examination. Moreover, petitioner also knew that any permanent appointment was contingent upon his ranking among the top three interested candidates on the certification list, and that any appointment remained subject to the statutory preference afforded to disabled veterans and veterans.

Second, we are unpersuaded by petitioner's assertion that his provisional service entitles him to retroactive credit toward permanent status. N.J.S.A. 11A:4-13(b) sets a maximum duration for such service, but does not operate to convert an overlong provisional appointment into a permanent one. Permanency arises only after appointment from an eligible list and successful completion of the full working test period. O'Malley, 109 N.J. at 316-17 (1987). As the CSC correctly concluded, neither the Civil Service Act nor the applicable regulations

18

permit the time served in provisional or temporary status to count toward, or to be tacked onto, the statutory working test period required for permanent service. See N.J.A.C. 4A:4-5.2(a); Azzara, 392 N.J. Super. at 328; Capibianco v. Civil Service Comm'n, 60 N.J. Super. 307, 319 (App. Div. 1960) (holding that the mere passage of time in a temporary appointment, or the CSC's failure to hold an examination, cannot convert temporary status into permanent status). Thus, despite the delay in the CSC's posting of the position, likely due to delays caused by the COVID-19 pandemic, petitioner's admittedly lengthy service as a provisional employee did not automatically result in a permanent appointment.

B.

In points II, III, and IV of petitioner's brief, he asserts that his termination was motivated by bad faith, improper purpose, and retaliatory anti-union animus. Petitioner argues the ALJ failed to properly consider the context and circumstantial evidence surrounding his termination. This argument, however, is belied by the record and lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Again, we add the following brief comments to amplify our opinion.

Bad faith "'contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will.'" Lustrelon, Inc. v.

Prutscher, 178 N.J. Super. 128, 144 (App. Div. 1981) (quoting New Amsterdam, etc., Co. v. Nat'l Newark, et al., Co., 117 N.J. Eq. 264, 277 (Ch. 1934)). Moreover, bad faith "requires a showing of some indicia of dishonest conduct or a showing of facts and circumstances . . . so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." Ibid. (citing Factors & Note Buyers, Inc. v. Green Lane, Inc., 102 N.J. Super. 43, 49-50 (Law Div. 1968)). In a working test period appeal, the burden rests squarely on the employee to establish, by a preponderance of the evidence, that the appointing authority acted in bad faith. N.J.A.C. 4A:2-4.3(b).

In addressing this issue, the ALJ found no evidence to suggest the County acted in bad faith in terminating petitioner, and that petitioner failed to meet his burden of showing bad faith animus. More particularly, the ALJ noted "the absence of contemporaneous writings, notes, conversations, and the like," to support petitioner's claim of retaliation during his employment, in any grievance, or in his rebuttal to the ninety-day evaluation. Instead, these allegations came to light only after his termination and within the context of an appeal to the CSC. The ALJ further credited both Supervisor West and Scelza's testimony in finding that petitioner was permitted to engage in union activities

20

during work hours and concluded that if anti-union animus existed, "the union representative, Ms. Scelza, would be particularly attuned to anti-union/labor activities—none of which she observed." The ALJ determined that if this animus or hostility existed at all, "it did not rise to the level of bad faith."

Petitioner's claim that Supervisor West's criticism of his performance was merely a pretext for his termination is equally unavailing. Rather, the record shows that petitioner's thirty and sixty-day reviews identified areas requiring improvement, specifically time management and communication, which persisted during the working test period. In his ninety-day review, petitioner was rated "below standard" in all areas except punctuality, with documented concerns about the quality and timeliness of his work, compliance, and team communication.

Additionally, petitioner offers no evidence that he remediated any of these concerns over his performance. Indeed, in his testimony, he explains that he did not have an opportunity to address certain issues raised by West just prior to his termination. Additionally, we note that petitioner failed to avail himself of the opportunity to meet with Supervisor West and the County management team prior to his termination when he called out sick and promptly left on a pre-approved vacation toward the end of his tenure, having failed to complete

21

assignments. Such actions are not indicative of an employee who was concerned about redressing issues raised by his employer. Even so, the record shows the ALJ thoughtfully and carefully considered the evidence presented and candidly concluded that "[b]ecause the facts as adduced are in equipoise and the burden here is on [petitioner] to show bad faith," petitioner did not meet his burden of persuasion by a preponderance of the evidence.

Similarly, we discern no error in the rejection of petitioner's reliance on temporal proximity between union activity and the adverse action taken against him. As the ALJ correctly recognized, "temporal proximity is, at most, a circumstance that may support an inference of a causal connection," but it is not sufficient by itself to warrant a finding of bad faith. See Maimone v. City of Atl. City, 188 N.J. 221, 237 (2006). Thus, based on this record, including the testimony and documentary evidence showing the number of times petitioner participated in union activity and the lack of any evidence to support his claim the County interfered in that work, the CSC decision is not arbitrary, capricious or unreasonable.

C.

Because we reject petitioner's claims in points I through IV, we need not specifically address his final point, which includes a request for benefits: the

CSC erred in declining to grant equitable relief, including reinstatement, back pay, benefits, seniority, and reasonable attorney's fees. We note only that such remedies are available only where "the employee demonstrates that the appointing authority took adverse action against the employee in bad faith or with invidious motivation." N.J.A.C. 4A:2-1.5(b). We are thus satisfied that the CSC's well-supported decision the County's conduct "did not rise to the level of bad faith," and we observe no basis to grant the equitable relief sought by petitioner.

Lastly, because petitioner did not prevail on his claims, we reject his application for counsel fees, which shall be awarded "where an employee has prevailed on all or substantially all of the primary issues before the Board." In re Hearn, 417 N.J. Super. 289, 303 (App. Div. 2010) (citing N.J.A.C. 4A:2-2.12(a)). All of petitioner's claims were properly rejected by the CSC, and thus, the necessary threshold for any equitable relief under N.J.A.C. 4A:2-1.5(b) has not been met.

In sum, given our limited review of agency decisions and deferring to the expertise of the ALJ in assessing the credibility of the witnesses, we conclude the CSC's final agency decision was not arbitrary, capricious or unreasonable. See Lavezzi, 219 N.J. at 171.

23

To the extent that we have not addressed any of petitioner's remaining claims, it is because they lack sufficient merit to warrant discussion in a written opinion, and the administrative decision is supported by sufficient credible evidence on the record as a whole.  See R. 2:11-3(e)(1)(D) and (E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M. C. Harley

Clerk of the Appellate Division

24                                                                A-1322-24